**U.S. EX REL. [SEALED] V. [SEALED]**


**TO BE FILED IN EASTERN DISTRICT OF TENNESSEE**

# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### CHATTANOOGA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, the STATES of CALIFORNIA, DELAWARE, FLORIDA, GEORGIA, ILLINOIS, INDIANA, IOWA, LOUISIANA, MARYLAND, MASSACHUSETTS, MICHIGAN, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VERMONT, VIRGINIA, and WASHINGTON, *ex rel.* JAMIE THOMPSON, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiff-Relator, | ) ) |
| v. | ) ) ) |
| ACADIA HEALTHCARE COMPANY, INC., AFFILIATES OF ACADIA HEALTHCARE COMPANY INC. TO BE NAMED, RIVERWOODS BEHAVIORAL HEALTH, LLC, and RIVERWOODS BEHAVIORAL HEALTH, LLC d/b/a LAKEVIEW BEHAVIORAL HEALTH, | ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

FILED

APR 1 7 2017

Clerk, U. S. District Court
Eastern District of Tennessee
At Chattanooga

Civil Action No. 1:17-cv-99

**FILED IN CAMERA AND UNDER SEAL** Mattice/Lee

Jury Trial Requested

Contents

COMPLAINT ................................................................................................... 1

I.    INTRODUCTION ................................................................................... 1
II.   JURISDICTION ...................................................................................... 4
      A.   Jurisdiction and Venue .................................................................. 4
      B.   The Parties ..................................................................................... 5
            1.   Defendants ............................................................................ 5
            2.   Relator .................................................................................. 6
      C.   Applicable Laws ............................................................................ 8
            1.   The Federal False Claims Act ............................................ 8
            2.   The Anti-Kickback Statute ............................................... 10
            3.   The State False Claims Acts .............................................. 11
III.  MEDICARE AND MEDICAID PROGRAMS .................................... 11
      A.   The Medicare Program ................................................................ 14
      B.   The Federal-State Medicaid Program.......................................... 27
IV.   ACADIA'S FRAUDULENT SCHEME ............................................... 38
      A.   Acadia is Obligated to Provide Quality Behavioral and Psychiatric Health
           Services. .................................................................................... 38
      B.   Defendants Knowingly Submitted or Caused the Submission of False Claims to
           Federal and State Health Care Programs. .................................. 40
            1.   Defendants Failed to Properly Admit Patients, Discharge Patients, or
                 Plan for and Treat their Psychiatric Conditions. ........................ 43
            2.   Defendants Failed to Provide Adequate Physician Oversight or
                 Staffing. ................................................................... 68
            3.   Defendants Billed for Medically Unnecessary Services. ..................... 71
            4.   Defendants Failed to Maintain Proper Facilities for Patient Care,
                 Including Licensure. .................................................... 74
            5.   Defendants Intentionally Falsified Documents in Response to
                 Government Inquiries, Audits or Investigations. ......................... 81
            6.   Defendants' Admissions Decisions May Have Been Improperly
                 Motivated by an Unlawful Kickback Scheme.............................. 85
      C.   Defendants Knew or Should Have Known Their Conduct was Leading to the
           Submission of False Claims. ........................................................ 86
            1.   High-Level Executives Knew or Should Have Known of the Severe
                 Staffing Shortages.......................................................... 87

2.    Defendants Took Affirmative Steps That They Knew or Should Have Known Contributed to the Seriously Inadequate Staffing. ........................... 91

3.    High-Level Executives Knew or Should Have Known That Intentionally Slashing Staff Could Lead to Patient Harm............................ 99

4.    The Staffing Levels Were So Deficient They Appear to Have Contributed to at Least One Patient Death................................................. 101

D.    Compliance with the Relevant Laws Was Material to the Government's Decision to Pay Because They Went to the Essence of the Services to be Provided by Acadia. ................................................................................................... 105

V.    DEFENDANTS UNLAWFULLY RETALIATED AGAINST RELATOR....... 107

COUNT I ............................................................................................................... 109

COUNT II .............................................................................................................. 110

COUNT III ............................................................................................................. 111

COUNT IV ............................................................................................................. 111

COUNT V ............................................................................................................... 112

COUNT VI ............................................................................................................. 113

COUNT VII ............................................................................................................ 114

COUNT VIII ........................................................................................................... 116

COUNT IX ............................................................................................................. 117

COUNT X ............................................................................................................... 119

COUNT XI ............................................................................................................. 120

COUNT XII ............................................................................................................ 122

COUNT XIII ........................................................................................................... 123

COUNT XIV ........................................................................................................... 124

COUNT XV ............................................................................................................ 126

COUNT XVI ........................................................................................................... 128

COUNT XVII .......................................................................................................... 129

COUNT XVIII......................................................................................................... 131

COUNT XIX ........................................................................................................... 132

COUNT XX ............................................................................................................ 133

COUNT XXI ........................................................................................................... 134

COUNT XXII .......................................................................................................... 136

COUNT XXIII ............................................................................................... 137

COUNT XXIV .............................................................................................. 138

COUNT XXV ............................................................................................... 139

COUNT XXVI .............................................................................................. 140

COUNT XXVII ............................................................................................. 142

COUNT XXVIII ............................................................................................ 143

COUNT XXIX ............................................................................................... 144

## COMPLAINT

1.    This is a *qui tam* action by Plaintiff-Relator Jamie Thompson ("Relator"),
through her undersigned counsel, on behalf of herself and the United States of America
("United States") and the States listed in the caption above ("States"), to recover treble
damages and civil penalties arising from the actions of Defendants Acadia Healthcare
Company, Inc. ("Acadia"), its related entities, Affiliates of Acadia to be named,
Riverwoods Behavioral Health, LLC, and Riverwoods Behavioral Health, LLC d/b/a
Lakeview Behavioral Health (collectively referred to as "Defendants" or "Acadia"), in
violation of the Federal False Claims Act, 31 U.S.C. § 3729 *et seq*., the various state false
claims acts, and the federal Anti-Kickback Statute, 42 U.S.C. §1320a-7b(b).

## I.   INTRODUCTION

2.    Acadia is a provider of inpatient behavioral healthcare services, with a
network of hundreds of behavioral healthcare facilities in 39 states, the United Kingdom
and Puerto Rico.  Acadia provides behavioral health and substance abuse treatment to its
patients in a variety of settings, including inpatient psychiatric hospitals, residential
treatment centers, outpatient clinics and therapeutic school-based programs.  Acadia
participates in the federal (and state) health care programs, including Medicare,
Medicaid, TRICARE (the Department of Defense program), the Department of Veteran's
Affairs health benefits plan ("VA's Plan"), the Federal Employees Health Benefits
("FEHB"), and others.  Throughout this Complaint, these terms may be used

interchangeably, including: "federal health care programs," "federal and state health care programs," and "Medicare," "Medicaid," and "TRICARE."

3.      The case is brought by a registered nurse who has over twenty years of first-hand and supervisory nursing experience.  Until recently, Relator Jamie Thompson served as the Director of Nursing at one of Acadia's Georgia facilities named in the Complaint, Lakeview Behavioral Health.  In addition to naming as a defendant the specific Acadia entity that employed Ms. Thompson, the Complaint also names other related-entities, based upon her knowledge of the company's corporate level decisions across facilities, as set forth in detail below.

4.      While an employee at the Lakeview facility, Ms. Thompson observed first-hand that Defendants failed to render critical services to patients that were material to the Government's decision to pay health care claims.  These failures were systemic and are believed to be ongoing, based upon Ms. Thompson's continuing communications with current employees of Acadia.  Ms. Thompson found the failures to render critical services to patients to be so troubling that she brought them to the attention of several managers and executive personnel while she was an employee at Acadia, as set forth below. However, notwithstanding the violations and resulting problems she identified that went to the heart of rehabilitating and treating acutely ill patients in need of care, Defendants ignored and belittled her concerns, reprimanded her, and then fired her for attempting to stop these violations.

5.     As set forth below, since at least 2013, Defendants knowingly made false or fraudulent representations and certifications material to federal and state claims for health care services, in violation of the False Claims Act, which are believed to be ongoing and pre-date 2013.  Specifically, Defendants made, or caused to be made, false or fraudulent claims to the federal and state health care programs, such as Medicare, Medicaid, and TRICARE, for nonexistent, grossly inadequate, materially substandard, worthless, and even harmful psychiatric and behavioral health services. The United States suffered damages when the federal and state health care programs paid Defendants for such false or fraudulent claims.

6.     From as early as at least 2013, Defendants knowingly failed to render critical behavioral health services to its patients.  These failures were the result of Defendants' corporate-level decisions, and were not simply limited to the facility where Relator worked.  Certain failures resulted in actual harm to patients.  And, it appears these failures continue to this day.  Consequently, although Defendants continually billed the federal and state health care programs for services for patients, the services were significantly deficient, non-existent, medically unnecessary, worthless, and/or harmful to patients.

7.     As set forth below, as part of Defendants' scheme, Defendants failed to properly admit patients, plan for or treat patients' psychiatric conditions, discharge patients, medicate patients, and maintain or provide adequate staffing or facilities.

3

Defendants often kept patients on service (and billed for them) for excessive or medically unnecessary lengths of stay, all the while billing the federal and state health care programs. Significantly, Defendants' corporate-level decisions to fail to provide sufficient, qualified staffing and oversight in the care of these patients led to many of these other failures. Further compounding the severe and continuous staffing shortages, Defendants' admissions decisions may have been improperly motivated by an unlawful kickback scheme. Finally, Defendants were well-aware of the problems set forth in this Complaint, and took steps to fabricate documents to hide information from government officials during audits and reviews.

## II.   <u>JURISDICTION</u>

### A.   **Jurisdiction and Venue**

8.    This action arises under the False Claims Act, 31 U.S.C. § 3729 *et seq*.

9.    Jurisdiction over this action is vested in this Court by 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331, in that this action arises under the laws of the United States; and by 31 U.S.C. § 3732(b) and 28 U.S.C. § 1367, in that the claims brought on behalf of the States arise from the same transactions or occurrences as the claims brought on behalf of the United States, pursuant to 31 U.S.C. § 3730, and are thus part of the same case or controversy.

10.    Venue is proper in this district under 28 U.S.C. §§ 1391 and 1395(a) and 31 U.S.C. § 3732(a) because one or more Defendants can be found, resides, and/or transacts business within the district.

**B.     The Parties**

**1.     Defendants**

11.    **Acadia Healthcare Company, Inc**. ("Acadia") is, or at all times relevant to this action was, a Delaware corporation with its corporate headquarters in Franklin, Tennessee.

12.    Acadia is in the business of purchasing, operating, and otherwise managing inpatient psychiatric facilities, residential treatment centers, group homes, substance abuse facilities and facilities offering outpatient behavioral healthcare services.

13.    **Affiliates of Acadia to be named ("Affiliates")** references any subsidiaries, affiliated companies, owners, managers, investors, entrepreneurs, partners, joint ventures, or other entities that were affiliated with Acadia during the relevant time frame.  Acadia conducts its business in the United States through limited liability companies and C-corporations. Acadia determines policies and practices that apply to the facilities that it operates nationwide, including the policies and practices at issue in this action.  Affiliated entities of Acadia to be named are believed to participate in the ownership, investment, and/or operation of these facilities in the United States.

14.    **Riverwoods Behavioral Health, LLC** ("Riverwoods") is one of Acadia's health care facilities acquired in 2008.  Riverwoods is a 75-bed psychiatric hospital located in Riverdale, Georgia that advertises behavioral health services for adults and adolescents on both an inpatient and outpatient basis.  Riverwoods operates in part through its "dba," Lakeview Behavioral Health, the facility at which Relator was employed.

15.    **Lakeview Behavioral Health** ("Lakeview") in Norcross, Georgia is one of Acadia's health care facilities that does business in the name of Riverwoods.  Lakeview is a 70-bed psychiatric hospital, which became a 90-bed psychiatric hospital providing services to adults and adolescents on both an inpatient and outpatient basis in 2016.

16.    Riverwoods and Lakeview submit and bill claims to the Medicare program under the same Medicare provider number 1174865513.  Riverwoods and Lakeview are sometimes referred to in this Complaint as "the Georgia facilities."

## 2.    Relator

17.    **Jamie Thompson** is the Relator.  She is a resident of Alpharetta, Georgia. Relator is a registered nurse.  In April 2016, Relator was recruited to become Lakeview's sixth Director of Nursing in approximately three years.  Relator served in that position until September 20, 2016, and was closely involved in the day-to-day operations of Lakeview.  Relator previously served for more than nine years as a Nurse Manager at Peachford Hospital in Atlanta, Georgia—a mental health hospital.  Relator has over

twenty years of nursing experience, including five years of nursing management experience.

18.     In her position as Director of Nursing for Lakeview, Relator learned of Acadia's corporate-level decisions that dictated how the individual Acadia facilities operated.  She also learned information specific to Riverwoods based upon communications with the Director of Nursing at Riverwoods and the physicians who worked at the Georgia facilities.

19.     Based on Relator's observations and the evidence described below, Defendants have devised and implemented a scheme to defraud the federal and state health care programs through systematically violating federal and state legal requirements at Defendants' facilities, which increased Defendants' revenues at the expense of patient care and the Government-funded programs, in violation of the Federal and state False Claims Acts.

20.     Accordingly, Relator brings this action on behalf of the United States, including its agency, the Department of Health and Human Services ("HHS") and its component, the Centers for Medicare & Medicaid Services ("CMS"), and on behalf of the states of California, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Montana, Nevada, New Hampshire, New Jersey, New Mexico, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, Virginia, and Washington.

21.     Prior to becoming aware of any known public disclosure under subsection (e)(4)(a) of 31 U.S.C. § 3730, Relator voluntarily disclosed to the Government the information on which the allegations or transactions in this claim are based; and Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions that may exist, and has voluntarily provided the information to the Government before filing an action under this section.  31 U.S.C. § 3730(e)(4)(A).  Relator is the original source of these allegations as defined in 31 U.S.C. § 3730(e)(4)(B).

22.     Relator alleges, based upon her personal knowledge and relevant documents and information, the facts set forth in this Complaint.

### C.     Applicable Laws

#### 1.     The Federal False Claims Act

23.     The False Claims Act provides, in part: Liability for Certain Acts.— (1) In general.—[ ] any person who— (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [ ] (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, [ ] is liable to the United States Government for a civil penalty of not less than $5,000 and not more than

$10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410 [1]), plus 3 times the amount of damages which the Government sustains because of the act of that person.  31 U.S.C. § 3729(a)(1)(A), (B), (G).

24.     Under the False Claims Act, scienter must be demonstrated: **Definitions**— For purposes of this section— (1) **the terms "knowing" and "knowingly"**— (A) mean that a person, with respect to information— (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud; (2) **the term "claim***" —  (A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that— (i)  is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government— (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; [] .  31 U.S.C. § 3729(b)(1)-(2).

25.     Further, under the False Claims Act, an individual may receive further relief from certain retaliatory actions:  (h) Relief from retaliatory actions.--(1) In general.-

9

-Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.  31 U.S.C.A. § 3730 (h).

### 2.     The Anti-Kickback Statute

26.     The Anti-Kickback Statute provides additional causes of action: (b) **Illegal remunerations**—(1) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind— (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.  (2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person— (A) to refer an

10

individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both. 42 U.S.C. § 1320a-7b(b).

27.    (h) **Actual knowledge or specific intent not required**—With respect to violations of this section, a person need not have actual knowledge of this section or specific intent to commit a violation of this section.  42 U.S.C. §1320a-7b(h).

### 3.    The State False Claims Acts

28.    The state False Claims Acts are cited below under Counts VI through XXIX, which assert claims on behalf of the states of California, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Montana, Nevada, New Hampshire, New Jersey, New Mexico, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, Virginia, and Washington.

## III.   MEDICARE AND MEDICAID PROGRAMS

29.    The treatment of mental health and substance abuse disorders is a critical priority of Congress, the Federal Government, and the states under the federal and state health care programs.  Congress enacted the Mental Health Parity and

Addiction Equity Act of 2008 to strengthen access to and fund services for mental health and substance abuse treatment for low income Americans. *See* 45 C.F.R. Part 146, Interim Final Rules Under the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008 (effective April 5, 2010).

> **Mental health and substance use disorder benefits make a difference.** These disorders affect society in ways that go beyond the direct cost of care. Without effective treatment, people with these health conditions may find it difficult to find or maintain a job, may be less able to pursue education and training opportunities, may require more social support services, and are more likely to have their housing stability threatened. Mental illness can be particularly disruptive for families, as family members often serve as caregivers for loved ones with serious mental illness. Substance use disorders frequently rob the happiness, potential and lives of the people who have them and significantly strain family and friends.

Executive Office of the President of the United States, The Mental Health and Substance Use Disorder Parity Task Force – Final Report (Oct. 2016), https://www.hhs.gov/sites/default/files/mental-health-substance-use-disorder-parity-task-force-final-report.PDF (emphasis added).

30.    The current executive budgetary agenda:

> Supports substance abuse treatment services for the millions of Americans struggling with substance abuse disorders.
>
> ***
>
> Invests in mental health activities that are awarded to high-performing entities and focus on high priority areas, such as suicide prevention, serious mental illness, and children's mental health.

Executive Office of the President, Office of Management and Budget,

"America First: A Budget Blueprint to Make America Great Again," at 22

(2017).

31.    Medicare paid over $4 billion to inpatient psychiatric facilities since 2013.

Federal, state, and local health care programs spent over $15 billion to treat substance

abuse disorders in 2009.

32.    Medicaid is the single largest payer for mental health services in the

United States and is playing a larger role in reimbursement of substance abuse

services.

33.    Instead of using these public health care funds to help a growing and

distressed population, Acadia's business model has been to buy hundreds of behavioral

health facilities, and mandate cost cutting measures that resulted in insufficient staff and

resources to provide the vital behavioral health services to patients that it was being paid

by the Government to provide.  Acadia's model is based upon a profit motive at the

expense of patient care.  In less than 2 years, Acadia expanded its business by over 600

percent buying over 500 facilities in over 30 states.  Since at least 2013, Acadia engaged

in a systematic practice of maximizing revenues by, among other things, significantly

cutting costs and staff such that Acadia rendered grossly deficient behavioral health

services to beneficiaries admitted to its outpatient and inpatient facilities.  As a result,

13

Acadia made victims of patients and their families, in addition to the federal and state health care programs.

34.    As recently as March 14, 2017, the United States Department of Health and Human Services ("HHS"), Office of Inspector General ("OIG"), Deputy Inspector General Gary Cantrell emphasized that "any case where we encounter the potential for patient harm – those investigations get our highest priority and they will continue to do so."  Bloomberg BNA Insight Center, "Budgetary Constraints May Reduce OIG Health-Care Fraud Investigations (Part 1)," Interview with Cantrell (March 14, 2017).  Deputy IG Cantrell further recognized that "oftentimes, in these fraud schemes, greed and the desire for money and profit outweigh patient care and sometimes cause patient harm."  This case is one such example.

## A.  The Medicare Program

35.    In 1965, Congress enacted Title XVIII of the Social Security Act to pay the costs of certain health care services for eligible individuals, also known as Medicare.  42 U.S.C. §§ 1395 *et seq.*

36.    The other federal and state healthcare programs have similar requirements and have similarly been defrauded by the Defendants.

37.    Medicare consists of two parts. Part A provides coverage for hospital costs, services rendered by hospitals, skilled nursing facilities, home health care, and hospice care. Part B provides coverage for physician services, outpatient hospital care, and other

miscellaneous medical services such as physical and occupational therapy.   *See 42*
U.S.C. § § 1395j-1395w-4.

38.    HHS is an agency of the United States whose activities, operations, and
contracts are paid from federal funds.  CMS is a division of HHS that is responsible for
the administration and supervision of the Medicare and Medicaid programs.  To
administer Part A and Part B Medicare reimbursement claims, HHS contracts with
private local insurance companies, known as "carriers" and "fiscal intermediaries," to
receive, review, and pay appropriate reimbursement claims related to services provided to
Medicare beneficiaries. *See* 42 U.S.C. § 1395u.

39.    Medicare providers such as Defendants have a legal duty to familiarize
themselves with Medicare's reimbursement rules, including those delineated in the
Medicare Manuals. *Heckler v. Cmty. Health Serv. of Crawford County, Inc.,* 467
U.S. 51, 64-65 (1984).  United States Supreme Court Justice Holmes wrote: "Men
must turn square corners when they deal with the Government." *Rock Island, A. & L.
R. Co. v. United States*, 254 U. S. 141, 254 U. S. 143 (1920).   As the Supreme Court
has further proclaimed, this observation has its greatest force when a private party
seeks to spend the Government's money. Protection of the public fisc requires that
those who seek public funds act with scrupulous regard for the requirements of law.
A health care provider, such as Acadia can expect no less than to be held to the most
demanding standards in its quest for public funds.  This is consistent with the general

rule that those who deal with the Government are expected to know the law. *Heckler v. Commun. Health Svcs.* 467 U.S. 51 (1984).

40.    As a participant in the Medicare, Medicaid and other federal and state health care programs, Acadia has a duty to familiarize itself with each health care program's legal requirements and to not violate the False Claims Act.

41.    Medicare Provider Agreements require health care providers to certify to the following:

> 2. I have read and understand the Penalties for Falsifying Information, as printed in this application. I understand that any deliberate omission, misrepresentation, or falsification of any information contained in this application or contained in any communication supplying information to Medicare, or any deliberate alteration of any text on this application form, may be punished by criminal, civil, or administrative penalties including, but not limited to, the denial or revocation of Medicare billing privileges, and/or the imposition of fines, civil damages, and/or imprisonment.

> 3. I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

> ***

> 6. I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not

16

submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

42.     Likewise, Medicaid Provider Agreements typically require health care providers to certify:

> I understand that any omission, misrepresentation or falsification of any information contained in this application or contained in any communication supplying information to Medicaid to complete or clarify this application may be punishable by criminal, civil or other administrative actions.
>
> ***
>
> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicaid and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

43.     To submit claims electronically, Medicare providers execute an Electronic Data Interchange Enrollment Form ("EDI form") wherein providers agree to "be responsible for Medicare claims submitted to CMS by itself, its employees, or its agents," and to "submit claims that are accurate, complete and truthful."

44.     By executing the EDI Enrollment Form, a provider also acknowledges "that all claims will be paid from Federal funds, that the submission of such claims is a claim for payment under the Medicare program, and that anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim as required by this Agreement may, upon conviction be subject

17

to a fine and/or imprisonment under applicable Federal law."

45.     Defendants submitted or caused to be submitted claims for payment to the federal health care programs electronically, upon information and belief, on forms known as a UB-92, HCFA-1450 or UB-04, and CMS-1450, which contain the following certification: "This claim, to the best of my knowledge, is correct and complete []."

46.     Defendants also were required to submit annual cost reports to CMS, in which a responsible official certified: "I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations."  The certification must also acknowledge that "misrepresentation or falsification of any information contained in the cost report may be punishable by criminal, civil or administrative action, fine and/or imprisonment under federal law."

47.     Pursuant to all provider agreements between the federal and state governments and Defendants, Defendants must comply with all state and federal regulatory requirements.

### 1.     Inpatient Psychiatric Facility Services

48.     Medicare defines an inpatient psychiatric facility ("IPF") as an institution that "is primarily engaged in providing, by or under the supervision of a physician, psychiatric services for the diagnosis and treatment of mentally ill

patients," "maintains clinical records necessary to determine the degree and intensity of the treatment provided to the mentally ill patient," and "meets staffing requirements sufficient to carry out active programs of treatment for individuals who are furnished care in the institution."

49.    Medicare pays for the services rendered at facilities such as Acadia's, including Riverwoods and Lakeview based, in part, on the prospective payment system for IPFs as defined in 42 C.F.R. §§ 412 – 413, *et seq.*

50.    Medicare imposes numerous requirements on services rendered for beneficiaries at IPFs because the care is expected to be specialized and specific to the patients who need those services.

51.    Medicare also mandates that the care and services rendered are medically necessary.

52.    Medicare does not cover Part A or B items and services that "are not reasonable and necessary for the diagnosis or treatment of illness or injury . . . ." 42 C.F.R. § 1395y(a)(1)(A).

53.    Medicare further states that "[f]or every service billed, [the provider] must indicate the specific sign, symptom, or patient complaint necessitating the service.  Although furnishing a service or test may be considered good medical practice, Medicare generally prohibits payment for services without patient symptoms or

complaints or specific documentation."  U.S. Department of Health and Human

Services, Centers for Medicare and Medicaid Services, Medicare Learning Network,

"Mental Health Services" (January 2015), at 17, https://www.cms.gov/Outreach-and-

Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/Mental-

Health-Services-Booklet-ICN903195.pdf.

54.    First, IPFs must furnish services through qualified personnel in several

different practice areas, including psychological services, social work services,

psychiatric nursing, and therapeutic activities.  42 C.F.R. § 412.27(b).

55.    Second, IPFs must maintain medical records that properly and

completely document the assessment of the patient, including a psychiatric

evaluation, the services needed, and treatment ultimately provided to patients

admitted to the facility.  42 C.F.R. § 412.27(c)(1), (2).

56.    Medicare requires psychiatric hospitals to "[m]aintain clinical records on

all patients, including records sufficient to permit CMS to determine the degree and

intensity of treatment furnished to Medicare beneficiaries, as specified in § 482.61."

42 C.F.R. § 482.60(c).

57.    Third, a patient's admission to a psychiatric hospital "must be clearly

documented as stated by the patient and/or others significantly involved," and must

include a history of findings and treatment provided for the psychiatric condition for

which the patient is hospitalized." 42 C.F.R. § 482.61(a).

58.     Fourth, IPFs must maintain records of individual comprehensive
treatment plans for each patient that documents specific statutory components
including:

(i)     A substantiated diagnosis;
(ii)    Short-term and long-range goals;
(iii)   The specific treatment modalities utilized;
(iv)    The responsibilities of each member of the treatment team; and
(v)     Adequate documentation to justify the diagnosis and the treatment and
        rehabilitation activities carried out.

42 C.F.R. § 482.61(c)(1), 442 C.F.R. § 412.27(c)(3).

59.     "The treatment plan received by the patient must be documented in such
a way to assure that all active therapeutic efforts are included." 42 C.F.R. §
482.61(c)(2).

60.     Fifth, IPFs must record progress notes by the physician, nurse, social
worker, and others involved in treating the patient.  Such progress notes must be
recorded weekly for the first two months of a patient's admission to an inpatient
psychiatric unit.  42 C.F.R. § 412.27(c)(4); 42 CF.R. § 482.61(d).

61.     Sixth, IPFs must document a discharge summary and what, if any,
aftercare services are necessary.  42 C.F.R. § 412.27(c)(5); 42 C.F.R. § 482.61(e).

62.     The Joint Commission that accredits and certifies health care entities
and is relied upon in the industry as a marker of quality and performance publishes

21

its own standards for psychiatric facilities that largely mirror the federal regulations.

63.     For accreditation, the Joint Commission propounds that the

medical record must contain the following clinical information, including:

- The reason(s) for admission for care, treatment, and services;
- The patient's initial diagnosis, diagnostic impression(s), or condition(s);
- Any findings of assessments and reassessments;
- Any allergies to food;
- Any allergies to medications;
- Any conclusions or impressions drawn from the patient's medical history and physical examination;
- Any diagnoses or conditions established during the patient's course of care, treatment, and services (including complications and hospital-acquired infections and intercurrent diseases);
- Any consultation reports;
- Any observations relevant to care, treatment, and services;
- The patient's response to care, treatment, and services;
- Any emergency care, treatment, and services provided to the patient before his or her arrival;
- Any progress notes;
- All orders;
- Any medications ordered or prescribed;
- Any medications administered, including the strength, dose and route;
- Any access site for medication, administration devices used, and rate of administration;
- Any adverse drug reactions;
- Treatment goals, plans of care, and revisions to the plan of care;
- Results of diagnostic and therapeutic tests and procedures;
- Any medications dispensed or prescribed on discharge;
- Discharge diagnosis; and
- Discharge plan and discharge planning evaluation

The Joint Commission and CMS Crosswalk: Comparing Hospital Standards and

CoPs, Table 1-1: Recent Standards Changes for Deemed Status Hospitals (2016),

http://www.jointcommissioninternational.org/assets/1/14/EBCMSX16Sample.pdf.

64.     All these necessary services must be rendered by the appropriate and adequately staffed personnel and supervised by a clinical director, service chief, or equivalent who meets the training and experience requirements mandated by the American Board of Psychiatry and Neurology or the American Osteopathic Board of Neurology and Psychiatry.  42 C.F.R. § 412.27(d)(1), (2).

65.     A psychiatric hospital must employ "adequate numbers of qualified professional, technical, and consultative personnel to:

(1) Evaluate patients;

(2) Formulate written individualized, comprehensive treatment plans;

(3) Provide active treatment measures; and

(4) Engage in discharge planning."

42 C.F R. § 482.62(a).

66.     Medicare emphasizes the necessity of physician involvement in a patient's active psychiatric treatment.  "The services of qualified individuals other than physicians, e.g., social workers, occupational therapists, group therapists, attendants, etc., **must be prescribed and directed by a physician to meet the specific psychiatric needs of the individual.  In short, the physician must serve as a source of information and guidance for all members of the therapeutic team**

23

**who work directly with the patient in various roles**." Medicare Benefit Policy

Manual, Chapter 2 – Inpatient Psychiatric Hospital Services, at 30.2.3 (effective 1-1-

2005)(emphasis supplied).

67.     Indeed, Medicare only pays for inpatient psychiatric services if a

physician certifies and recertifies the need for services at 12 and/or 30 day intervals

after admission.  42 C.F.R. § 424.14(a).  A physician must certify that the inpatient

psychiatric services (1) "could reasonably be expected to improve the patient's

condition," (2) that services were actually rendered, and (3) that "the patient

continues to need, on a daily basis, active treatment furnished directly by or requiring

the supervision of inpatient psychiatric facility personnel."  42 C.F.R. § 424.14(c).

68.     Medicare also requires that IPFs have a registered nurse available 24-7

and "**adequate numbers of registered nurses, licensed practical nurses, and**

**mental health workers** to provide nursing care necessary under each inpatient's

active treatment program and to maintain progress notes on each inpatient."  42

C.F.R. § 412.27(d)(3)(emphasis supplied).

69.     Pursuant to the prospective payments for IPFs, Medicare pays a federal

per diem base rate for each day that a patient is in the IPF.

### 2.     Outpatient Hospital Psychiatric Services

70.     Medicare also pays for certain outpatient services rendered at those

facilities through the Part B program.  These services are characterized as outpatient hospital services.

71.    Medicare defines a hospital outpatient as "a person who has not been admitted by the hospital as an inpatient but is registered on the hospital records as an outpatient and receives services (rather than supplies alone) from the hospital." Patients who receive care during the day at a hospital and are otherwise characterized as "day patients" are also considered outpatient.  Medicare Benefit Policy Manual, Chapter 6 – Hospital Services Covered under Part B, at 20.2 (effective 1-1-2008).

72.    Medicare covers outpatient psychiatric services that are incident to a physician's service and reasonable and necessary for the diagnosis or treatment of the patient's condition.  "This means the services must be for the purpose of diagnostic study or the services must be reasonably expected to improve the patient's condition."  Medicare Benefit Policy Manual, Chapter 6 – Hospital Services Covered under Part B, at 70.1 (effective 5-7-2004).

73.    Medicare covers numerous outpatient psychiatric services including individual and group therapy, therapeutic drugs, psychiatric counseling, diagnostic services, and patient education.  Medicare Benefit Policy Manual, Chapter 6 – Hospital Services Covered under Part B, at 70.1(C)(1).

74.    Medicare also covers partial hospitalization programs ("PHPs") for

patients who are discharged from inpatient hospital treatment, and the PHP is in lieu

of continued inpatient admission, or for patients who in the absence of PHP would be

at risk of requiring inpatient hospitalization.  Medicare Benefit Policy Manual,

Chapter 6 – Hospital Services Covered under Part B, at 70.3(B)(1)(effective 9-13-

2014).

75.     For all outpatient psychiatric services, Medicare requires significant

documented physician involvement:

- Services must be prescribed by a physician and provided under individual written plan of treatment established by a physician after any needed consultation with appropriate staff members.
- Services must be supervised and periodically evaluated by a physician to determine the extent to which treatment goals are realized.
- Physician entries in medical records must support this involvement.
- The physician must also provide supervision and direction to any therapist involved in the patient's treatment and see the patient periodically to evaluate the course of treatment and to determine the extent to which treatment goals are being realized and whether changes in direction or emphasis are needed.

Medicare Benefit Policy Manual, Chapter 6 – Hospital Services Covered under Part

B, at 70.1(A)(1), (2).

76.     PHP admissions require further specific documentation of physician

involvement including signed certifications upon admission and recertifications.

PHP admissions also require comprehensive and detailed treatment plans and

documented progress notes.  Medicare Benefit Policy Manual, Chapter 6 – Hospital

Services Covered under Part B, at 70.3(B)(5).

26

77.     Medicare only covers outpatient psychiatric services for patients who have some reasonable expectation of improvement – "[t]he treatment must, at a minimum, be designed to reduce or control the patient's psychiatric symptoms so as to prevent relapse or hospitalization, **and** improve or maintain the patient's level of functioning."  Medicare Benefit Policy Manual, Chapter 6 – Hospital Services Covered under Part B, at 70.1(A)(3)(emphasis supplied).

## B.     The Federal-State Medicaid Program

78.     Medicaid is a health insurance program jointly administered by the federal and state governments.  CMS works with the states to properly administer the Medicaid program.

79.     Beneficiaries eligible for Medicaid include low-income children, pregnant women, parents, seniors, and individuals with disabilities.

80.     Services intended to treat both mental and substance abuse conditions are referred to as behavioral health services.

81.     The federal-state Medicaid program is the single largest payer for behavioral health services.

82.     The Social Security Act Section 1905(a) provides for the coverage of the following behavioral health services pursuant to Medicaid:

> Diagnostic, screening, preventive, and rehabilitative services recommended by a licensed provider for the maximum reduction of physical or mental disability and restoration of an individual to the best

27

possible functional level; Inpatient psychiatric hospital services for children and adolescents under 21 and for those 65 and older who have mental disabilities; and Individuals 22 to 64 who need services that are more intensive may receive services depending on what the State plan allows.

83.    State Medicaid programs must offer Early and Periodic Screening, Diagnostic and Treatment (EPSDT) services for Medicaid beneficiaries.  Social Security Act Section 1905(r).

84.    Mandatory EPSDT services include comprehensive mental health development assessment, health education, and "such other necessary health care, diagnostic services, treatment, and other measures described in Section 1905(a) to correct or ameliorate defects and physical and mental illness and conditions discovered" through screening.

85.    Each state's Medicaid program sets forth rules and regulations that Defendants must follow regarding Acadia's facilities in that state.  For example, the Georgia Medicaid Program, administered through the Georgia Department of Community Health, funds and furnishes behavioral health services for its eligible Medicaid beneficiaries pursuant to the Georgia Department of Community Health rules and regulations.

86.    Any health care provider seeking payment directly from Georgia Medicaid is required to sign a provider agreement affirming that it will comply with all the state and federal laws and regulations applicable to the Medicaid program.

28

87.     The Georgia Department of Behavioral Health and Developmental Disabilities provides additional guidance to ensure that Georgians with behavioral health challenges receive "easy access to high-quality care that leads to a life of recovery and independence for the people we serve."

88.     Pursuant to the Georgia Medicaid regulations, drug abuse treatment and education programs are required to have program operations that include a documented and implemented process for screening, intake or admission, assessment, treatment planning, evaluation of treatment, discharge, behavior management protocol, and appropriate medication administration.  Rules of Georgia Department of Community Health, Healthcare Facility Regulation, Chapter 111-8-19, Rules and Regulations for Drug Abuse Treatment and Education Programs, at Section 111-8-19-.09(2) (9-2013) ("GA Drug Regs"); Chapter 111-8-68, Rules and Regulations for Residential Mental Health Facilities for Children and Youth, at Section 111-8-68-.05(4)(b) ("GA Mental Health Regs").

89.     The Georgia Drug and Mental Health regulations largely impose similar requirements on providers to the Medicare regulations and are further described below as "Georgia Medicaid."

### 1.     Initial Screening and Assessment

90.     First, all persons referred to the program must be screened by qualified staff persons and such screening must be documented.  GA Drug Regs, Section 111-

8-19.13(1)(a); GA Mental Health Regs, Section 111-8-68.07(1)(a), (1)(a)(6).

91.     Georgia Mental Health regulations further state that the initial assessment must be written by a physician and "shall clearly indicate the patient's needs as related to the services offered by the facility."  GA Mental Health Regs, Section 111-8-68.07(1)(a)(6), (7).

92.     Second, all persons admitted to the program must be evaluated by a qualified staff person and "[s]uch evaluations shall include a comprehensive assessment of the client's physical, emotional, behavioral, social, recreational, and educational status and needs."  GA Drug Regs, Section 111-8-19.13(1)(b), GA Mental Health Regs, Section 111-8-68.07(2)(a).

93.     Georgia Mental Health regulations provide specific detail about what the patient's initial assessment should involve including at least a physical and neurological assessment by a licensed physician, nurse practitioner, or physician's assistant, a nursing assessment, an educational or vocational assessment, and recreational assessment.  GA Mental Health Regs, Section 111-8-68.07(2)(a).

## 2.     Treatment Plans and Progress Notes

94.     Third, for all persons admitted, the program "must develop and implement a complete individualized treatment plan for each client," and "[s]uch treatment plans shall be modified and updated as necessary, depending upon the clients' needs." GA Drug Regs, Section 111-8-19-.14, GA Mental Health Regs,

Section 111-8-68.07(2)(b)("A psychiatrist as well as multidisciplinary professional staff must participate in the preparation of the plan and any major revisions.").

95.     Treatment plans should include preliminary or initial and complete or comprehensive plans.  Initial treatment plans should be formulated at time of admission.  GA Drug Regs, Section 111.8-19-.14(a); GA Mental Health Regs, Section 111.8-68.07(2)(b).

96.     The complete or comprehensive treatment plan must be formulated by a multi-disciplinary team, completed within fourteen to thirty days from admission, and revised at least monthly or more frequently as necessary.  Georgia Medicaid requires the treatment plan to include:

- Complete assessment of the patient;

- Specific treatment goals, stated in measurable terms

- Services and/or interventions expected to be provided to help the patient achieve those goals and outcomes;

- Staff who are responsible for coordinating the treatment; and

- Expected course of treatment.

GA Drug Regs, Section 111.8-19-.14(b); GA Mental Health Regs, Section 111.8-68.07(2)(b).

97.     Georgia Medicaid repeatedly emphasizes the importance of behavioral health entities maintaining accurate and complete records for patients admitted to

31

these programs.  GA Drug Regs, Section 111-8-.09(6); GA Mental Health Regs,

Section 111-8.68.07(12).

98.    Fourth, Georgia Medicaid mandates that the progress of patients must be

documented in writing and include chronological observations of the clients' clinical

course of treatment, the client's response to that treatment, and the client's progress

towards achieving individual goals.  Such progress notes are required to be

maintained on a daily and weekly basis.  GA Drug Regs, Section 111-8-19-.14(c);

GA Mental Health Regs, Section 111-8-68.07(18).

### 3.    Staffing Requirements

99.    To properly provide for all the services mandated above, Georgia

Medicaid requires that programs have "sufficient types and numbers of staff" "to

provide the treatment and services offered to clients and outlined in its program

description."  GA Drug Regs, Section 111-8-19-.10(1); GA Mental Health Regs,

Section 111-8-68-.05(5)(a).

100.    The Georgia Medicaid regulations repeatedly explain and emphasize

the importance of sufficiently trained staff at behavioral health facilities for patient

care:

- All screening and admission of patients "shall be done by a staff person

   who has been determined to be qualified by education, training,

   experience, and who are licensed/certified if required by state practice

32

acts to perform such screenings," GA Drug Regs, Section 111-8-19-

.13(1)(a), (b);

- Behavior management "shall be administered by trained staff and shall

   be appropriate for the client's age, intelligence, emotional makeup and

   past experience," GA Drug Regs, Section 111-8-19-.26(1)(d); and

- Emergency safety interventions "may only be used by staff trained in the

   proper use of such intervention," GA Drug Regs, Section 111-8-19-

   .26(2)(a), (b).

101.   Staffing requires that a registered nurse be on duty at the facility at all

times, and that a physician be on call 24-7 and within 60 minutes of the facility.  GA

Mental Health Regs, Section 111-8-68-.05(3)(a), (b).

### 4.   Administering Drugs

102.   Administration of certain pharmaceutical products, including certain

narcotics classified as Schedule II drugs, requires written prescriptions by a

practitioner.  Oral orders are only permitted in emergencies.  U.S. DOJ, Drug

Enforcement Administration, Office of Diversion Control, Practitioner's Manual: An

Informational Outline of the Controlled Substances Act ("DEA Manual"), at 23

(2006).

103.   Schedule II substances "have a high potential for abuse with severe

psychological or physical dependence."  DEA Manual at 5.

33

104.    Examples of Schedule II substances include oxycodone (OxyContin, Percocet), meperidine (Demerol), hydromorphone (Dilaudid), methadone (Dolophine), fentanyl (Sublimaze or Duragesic), and morphine.  DEA Manual at 5.

105.    Practitioners or health care providers that intend to administer and dispense Schedule II substances for maintenance and detoxification treatment must also register as a narcotic treatment program with the U.S. Drug Enforcement Administration ("DEA"), the Center for Substance Abuse Treatment (CSAT) in the Substance Abuse and Mental Health Services Administration (SAMHSA) of HHS, and the applicable state methadone authority.  *See* GA Drug Regs at Section 111-8-18-.15.

106.    The administration of other drugs similarly requires specific training and credentials.  For instance, physicians cannot prescribe suboxone for opioid addiction treatment without being registered with the DEA, as described above, or receiving some type of certification in addiction treatment and applying for a special DEA number.  The National Alliance of Advocates for Buprenorphine Treatment, "Who Can Prescribe Buprenorphine," https://www.naabt.org/faq_answers.cfm?ID=29.

107.    Further, physicians who are treating patients with suboxone cannot be responsible for more than 30 patients on such addiction treatment at any one time.  The "30 patient restriction" applies irrespective of whether the physician is a solo

practitioner, part of a group practice, or affiliated with different health care facilities

and locations.  SAMHSA, Clinical Guidelines for the Use of Buprenoprhine in the

Treatment of Opioid Addiction, Chapter 6 Policies and Procedures (2014),

https://www.ncbi.nlm.nih.gov/books/NBK64234/.

> ### 5.    Discharge Planning

108.   Georgia Medicaid requires that behavioral health facilities create and

maintain a written record ("summary") of the patient's treatment and reasons for

discharge.  GA Drug Regs, Section 111-8-19-.17(a); GA Mental Health Regs,

Section 111-8-68.07(2)(c), (19).

109.    Statutorily-mandated discharge-planning for mental health treatment

must begin at the time of admission and include a projection of a possible discharge

date to allow for a period of transition for the patient back into the community.  GA

Mental Health Regs, Section 111-8-68.07(2)(c).

110.    The mental health discharge summary "shall include the initial

formulation and diagnosis, clinical resume, final formulation, and final primary and

secondary diagnoses, the psychiatric and physical categories."  GA Mental Health Regs,

Section 111-8-68.07(19).

111.    Statutorily-mandated discharge-planning for substance abuse services

involves both a discharge summary and an aftercare plan.

112.    The substance abuse discharge summary "shall be completed by the

35

person who has primary responsibility for coordinating or providing for the care of the client, and it shall include a final assessment of the client's status at the time of discharge, summary of progress towards treatment goals, and the reasons the client was discharged prior to completing treatment." GA Drug Regs, Section 111-8-19-.17(a).

113.   The substance abuse discharge summary must be completed within a specific number of days from when the facility discharges the patient, and under the Georgia Mental Health regulations, the summary must be in writing and signed by a physician. *See id*.

114.   For patients who complete treatment at the facility, aftercare plans must be developed and completed prior to discharge. GA Drug Regs, Section 111-8-19-.17(b).

115.   The aftercare plan "shall be completed by the person who has primary responsibility for coordinating or providing for the care of the client, and it shall include a final assessment of the client's status at the time of discharge, summary of progress towards treatment goals, a description of what services and supports the client is expected to need following discharge, and a description of potential barriers to overcome to maintain a drug free life style." GA Drug Regs, Section 111-8-19-.17(b).

36

### 6.    Facility Requirements

116.   Georgia Medicaid also imposes certain facility requirements on health care providers that submit claims for the provision of behavioral health services. Georgia Medicaid requires that facilities "shall provide an environment that is therapeutic to and supportive of all the patients, their healthy development and their changing needs."  GA Mental Health Regs, Section 111-8-68-.06.  In particular, Georgia Medicaid requires that:

(a) Facilities shall be designed to meet the needs of the age group of the patients and the objectives of the program;

(b) Facilities shall be maintained in a safe and clean manner and must meet fire, safety, health and sanitation regulations;

(c) There shall be adequate and appropriate space and equipment for all facility programs and their various functions within the facility; and

(d) Facilities shall provide sufficient space and equipment to ensure housekeeping and maintenance programs sufficient to keep the building and equipment clean, tidy, and in a state of good repair.

GA Mental Health Regs, Section 111-8-68-.06.

117.   To be entitled to reimbursement from the federal and state health care programs, Defendants must comply with these regulations and certifications.  These regulations explicitly govern the care that must be afforded to federal and state health care beneficiaries before Defendants are entitled to reimbursement by the government.

37

118.    From at least 2013 through 2016-early 2017, Acadia received aggregate payments from the Medicaid and Medicare programs of more than $2.6 billion for claims in nursing home services to Medicaid and Medicare eligible residents.

## IV.   ACADIA'S FRAUDULENT SCHEME

### A.  Acadia is Obligated to Provide Quality Behavioral and Psychiatric Health Services.

119.   Patients (and their families) suffering from behavioral disorders are vulnerable, as these disorders tend to be complicated and often involve substance abuse and more than one mental health diagnosis.

120.    According to HHS, behavioral disorders in children involve a pattern of disruptive behaviors that last for at least 6 months and cause problems in school, at home, and in social situations.  They may involve inattention, hyperactivity, impulsivity, defiant behavior, drug use, and criminal activity.

121.   Acadia represents publicly that it is committed to clinically excellent and compassionate care rendered by a treatment team that "ensure[s] that the interventions that are being implemented are working to successfully help you meet your treatment goals."

122.   As of December 31, 2014, Acadia operated 78 behavioral healthcare facilities with over 5,800 beds in 24 states, the United Kingdom, and Puerto Rico.

123.   In less than two years, by June 30, 2016, Acadia dramatically expanded its operations by over 600 percent and now consists of more than 590 behavioral healthcare facilities with approximately 17,800 beds in 39 states, the U.K., and Puerto Rico.

124.   Acadia receives a substantial portion of its revenue from federal and state taxpayer-funded health care programs, such as Medicare, Medicaid, TRICARE, and FEHB.

125.   Acadia's year to date revenue from the federal and state health care programs in 2016 was over $2.6 billion.  The payor mix was 41 percent Medicaid, 16 percent Medicare, 31 percent commercial health insurance, and 12 percent self-pay and other.  For the first nine months in 2016, Medicaid paid Acadia $542 million, and Medicare paid Acadia $198 million.

126.   In years 2012-2015, Medicaid paid Acadia $263 million, $353 million, $395 million, and $609 million, respectively.  In years 2012-2015, Medicare paid Acadia $48.9 million, $158 million, $200 million, and $214 million, respectively.

127.   On a combined basis, revenue related to the Medicare and Medicaid programs was 58 percent, 70 percent and 75 percent of all revenue before provision for doubtful accounts for the years 2014, 2013 and 2012, respectively.

128.   Acadia publicly touts its staff, including its intake teams that purportedly determine the "most appropriate level of care," its admissions staff who purportedly ensure that the admission process is "simple and streamlined," its treatment teams

39

that purportedly work collaboratively with patients to ensure they are receiving the care they need, and its discharge efforts through the development of purportedly "thorough aftercare plans" "to encourage continued healing through ongoing support."

129.  On paper and as marketed, Acadia's standards of care appear consistent with the Medicare and Medicaid requirements for psychiatric facilities furnishing inpatient and outpatient services.

130.  In practice, since at least 2013, Acadia knowingly failed to render adequate behavioral and psychiatric health services, which were statutorily-mandated, to vulnerable and at-risk youth, seniors and low income residents, in violation of the False Claims Act, as described below.

**B.     Defendants Knowingly Submitted or Caused the Submission of False Claims to Federal and State Health Care Programs.**

131.  Defendants were responsible to perform the services for which they accepted payment, and thus to ensure that Acadia facilities and staff provided patients with statutorily-mandated behavioral and psychiatric health services that met the Medicare and Medicaid regulatory requirements and provided "the maximum reduction of physical or mental disability and restoration of an individual to the best possible functional level."  Social Security Act 1905(a).

132.  Instead, from as early as at least 2013, Defendants knowingly failed to

render critical behavioral health services to their patients—services that were material to the government's decision to pay claims. These failures were systemic. They appear to have resulted in harm to patients. And, it appears these failures have not been remedied. Consequently, although Defendants continually billed the federal health care programs, the services they should have provided to patients were significantly deficient, worthless, or in some cases non-existent. More specifically, and as further described below:

- Defendants failed to assess properly (or at all) patients for admission to Acadia facilities, and at times, admitted patients with no documented evidence of psychiatric conditions or substance abuse and/or without the required physician involvement, which includes evaluation and an admission order;

- Defendants failed to create, revise, or update treatment plans for patients during their time at Acadia, and even when plans were created, they were so deficient, not accounting for patients' serious physiological or basic medical issues (such as diabetes or seizure), or psychiatric and/ mental health concerns, that the plans were at times detrimental to patients' health and well-being;

- Defendants failed to discharge-plan properly (or at all) for patients, and, at times, had no knowledge of to whom, where, when, or how a

41

patient would be discharged even on the very day the patient was being discharged;

- Defendants failed to administer medications in accordance with federal and state laws, and as prescribed by physicians.  In some instances, Defendants failed to give patients vital medication.  In other instances, Defendants gave patients narcotics or other serious medications without a physician ever evaluating the patient or providing the necessary orders;

- Defendants failed to maintain proper and adequate facilities to care for vulnerable patients, in violation of Medicare, Medicaid, and state licensure laws; Defendants kept patients on service (and billed for them) for excessive and medically unnecessary lengths of stay;

- Defendants failed to provide sufficient, qualified staffing and oversight in the care of these patients, which made it essentially impossible for the patients to receive the services they needed and for which Defendants were being paid;

- Defendants intentionally falsified or destroyed patient medical records in response to government inquiries, audits or investigations;

- Defendants admitted patients who did not need or would not benefit from behavioral health services, and may have admitted them only

42

because of unlawful kickback arrangements with referring providers, and;

- Defendants knew or should have known that their failures set forth above: (a) were not insignificant, minor or technical violations; (b) had a natural tendency to influence the Government's decision to pay the claims; (c) were violations that went to the essence of the bargain, or health care services to be provided; (d) were something that a reasonable man would attach importance to; and (e) led to the submission of false claims to the federal and state health care programs.

Further, Defendants' systemic failure to render critical services to patients appears to be ongoing.

### 1.   Defendants Failed to Properly Admit Patients, Discharge Patients, or Plan for and Treat their Psychiatric Conditions.

133.   Acadia offers both inpatient and outpatient services for federally-insured patients. Acadia accepted payment for, and was obligated to provide, certain statutorily-mandated services for each patient. These services would include: performing an initial assessment of the patient, admitting the patient to Acadia's facilities based on a physician's order, evaluating the patient for the appropriate and necessary treatment to meet the patient's diagnoses, creating a treatment plan specific to the patient's conditions, rendering all reasonable and necessary services, evaluating the patient's progress, and

43

planning for the patient's eventual discharge.  *See* 42 C.F.R. § 412.27(c); GA Drug

Regs, Section 111-8-19.13(1); GA Mental Health Regs, Section 111-8-68.07(1).

134.   Both Medicare and Medicaid require documentation of the patient's

initial assessment, treatment plan, progress notes, and discharge planning.  *See* 42

C.F.R. § 412.27(c); GA Drug Regs, Sections 111-8-.09(6), 111-8-19-.14(c); GA

Mental Health Regs, Section 111-8.68.07(12).  Documentation is not simply a

"paperwork requirement."

135.   Good medical documentation promotes the best interests of patients and

is often the primary (and only) record of a patient receiving a service.  Recording all

relevant information of a patient's care helps doctors and medical staff monitor

what's been done, and minimizes the risk of errors creeping into the treatment

process.  Careful attention to detail is also said to reduce the likelihood of patients

returning for additional treatment.  Appropriate medical records document basic facts

of patient care, including what was done by whom, and what results occurred.

Compiling meaningful clinical details in one place is necessary to supplement the

clinician's memory of crucial events that occur later in treatment.  Accurately

recording all complaints and symptoms of a patient also helps other clinicians who

later care for the patient to identify trends, while guiding them in the development of

treatment plans.  It also believed that maintaining appropriate medical records for a

patient leads to improved outcomes.  For example, keeping proper records improves

patients' clinical outcomes once they leave the hospital, according to research. After discharge, patients can experience adverse events such as drug reactions, infections and procedural complications. In short, sloppy documentation is often equated with sloppy care and can result in sloppy continuum of care.

136. Further, due to the large numbers of federal government beneficiaries who receive vital and life-saving services paid for by Medicare and Medicaid, CMS has stated publicly how important maintaining good patient records is to the medical system. "It is essential that providers of mental health services document their services fully in the medical record, because if the records are incomplete, the provider is at risk of losing Medicare payments in the event of a claims audit." HHS, CMS, Medicare Learning Network, "Summary of Medicare Reporting and Payment of Services for Alcohol and/or Substance (other than Tobacco) Abuse Structured Assessment and Brief Intervention (SBRT) Services," (April 28, 2016), https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNMattersArticles/downloads/SE1013.pdf

137. This is how Acadia represents itself on its website homepage: *Acadia Healthcare's behavioral health treatment facilities are specialized in helping children, teenagers, and adults suffering from mental health disorders and/or alcohol and drug addiction. Our expertise in behavioral health allows us to provide the highest standard of treatment allowing recovery for the individual and their families.*

*Our dedicated clinical teams across the country are passionate about every single one of their patients and their individual recovery.  Our experienced, highly skilled behavioral health clinical teams which include psychiatrists, physicians, nurses, social workers and addiction professionals, are changing lives every day and in many cases saving lives every day.*

138.   The Government therefore expects Acadia to conduct itself like a sophisticated provider of behavioral health services and to be well-aware of the importance of documentation to both the care and treatment of patients, as well as the federal and state health care reimbursement systems.

139.   These same expectations are placed upon the individuals identified in this Complaint who are expected to behave as highly-trained professionals.

140.   Acadia recruited Relator to become its seventh Director of Nursing at its Lakeview facility in only three years to help revamp a troubled program.  The fact that six directors of nursing had come and gone in three years was itself a troubling sign of a facility that was not meeting certain minimum standards.

141.   Relator reported directly to the CEO of Lakeview, CEO 1, and the CFO of Lakeview, CFO 1.

142.   When Acadia hired Relator, she was told by the Lakeview Chief Medical Director (Med. Dir. 1), and by Acadia Regional Vice President, Reg. VP 1, that

Lakeview "was a mess." Relator generally understood that to mean that the facility was not providing the quality of care to patients that it should have been providing.

143.   Relator viewed the fact that the facility "was a mess" as a professional challenge and believed she could assist to improve the services and care to patients.

144.   When Relator was hired in February 2016, Acadia's staff turnover was high.

145.   Since Lakeview had opened its doors in 2013, there had been four medical directors and six directors of nursing who were hired and then either quit or were fired. That is a particularly high-level of staff turn-over for a three-year period.

146.   Although Relator understood the work would be challenging, Acadia management promised Relator that she would have the necessary resources to correct the serious deficiencies at the facility.

147.   For example, Relator was promised that she could hire appropriate staff, have them properly trained, take appropriate measures to retain staff, and hold staff accountable for their actions.

148.   The moment Relator started her in her position at Acadia, she witnessed serious deficiencies in the care that was required to be provided to patients.

149.   For example, Lakeview did not have any written policies or procedures specific to its inpatient or outpatient programs.

150.   The absence of written policies and procedures at a facility obligated to treat patients with serious conditions was alarming.  Based upon her experience, Relator believed the absence of written policies and procedures needed to be promptly remedied.

151.   Relator immediately expressed her concern to upper management about the lack of written policies and procedures and offered to create some for use at Lakeview.  Her suggestion was not well-received.

152.   Relator's immediate concerns were aggravated by her discovery that Lakeview failed to properly admit patients, discharge patients, or plan for and treat patients' psychiatric and substance abuse conditions, in violation of federal and state requirements.

153.   Defendants knew or should have known that their failure to properly admit patients, discharge patients, or plan for and treat their psychiatric conditions: (a) was not an insignificant, minor or technical violation; b) had a natural tendency to influence the Government's decision to pay the claims; (c) was a violation that went to the essence of the bargain, or health care services to be provided; (d) was something that a reasonable man would attach importance to; and (e) led to the submission of false claims to the federal and state health care programs.

### a.       Defendants Failed to Properly Admit Patients.

154.   Acadia admitted various patients without any physician involvement

48

whatsoever.  Acadia also failed to assess properly patients for admission to Acadia facilities, and at times, admitted patients with no documented evidence of psychiatric conditions or substance abuse and/or without any physician evaluation or admission orders.

155.   On a consistent basis, the Georgia facilities admitted patients without physician interaction, assessment, or evaluation, in direct violation of federal and state requirements that physicians evaluate patients and direct their care.

156.   Without any physician assessment of the patient, or physician-directed care, many patients' needs were unaddressed.  Further, giving the management-directed staffing shortages, Acadia was not able to provide the necessary services.

157.   Acadia had what amounted to an open admissions policy at the Georgia facilities.  This so-called open policy meant that Acadia was willing to accept every patient referral without regard to whether the patient needed any mental or substance abuse services, or whether the facility was appropriately staffed or able to properly admit, evaluate and treat the patient.  It was not uncommon for Lakeview to admit 15 – 20 patients in a single day, which Relator often believed to be beyond the facility's capability and capacity.

158.   Indeed, the Georgia facilities often were referred to as the "last ditch effort" among local health care providers and practitioners.  Relator believed that it was inappropriate, and inconsistent with federal and state requirements, to admit—as

49

a matter of course—almost every patient who was referred.  Relator does not believe that Acadia was accepting all patients who were referred for altruistic reasons (or because they could provide adequate services to them), but rather because it was profitable for Defendants.  In addition, Relator believes Acadia was motivated by improper kickbacks from referring providers.

159.   Prior to June 2016, Lakeview and Riverwoods were accredited for 70 and 75 beds, respectively.   Patient census (or count) at the facilities sometimes (improperly) exceeded those numbers.  On one occasion when investigators from CMS arrived unannounced at Lakeview, Lakeview representatives scrambled to discharge patients because there were 80 patients at the facility.  After June 2016, Lakeview became accredited for 90 beds.

160.   The sudden and abrupt discharge of a patient is almost never in the best interests of a patient.  The discharges were done to avoid detection by CMS that the facility was not in compliance with its accreditation standards—standards which are set for the health and safety of patients.

161.   Although the average patient population at each Georgia facility was between 60 – 80 patients, the two Georgia facilities employed only a single internist, Physician 1.  She alone performed the mandated medical history and physicals for patients upon intake to assess the patient's physical well-being and appropriateness for admission.

162.   A single physician to conduct the evaluation for almost every patient at intake at two different facilities was nearly impossible and certainly not adequate. Each patient was required to have a private and comprehensive evaluation.  The two facilities where Physician 1 conducted the evaluations were located 37 miles apart at either end of the Atlanta area.

163.   Notably, because of insufficient staffing, patient confidentiality was violated, and patients were not treated with dignity during history, physical, and clinical assessments at the time of admission and during their stay.  Rather, they were lined up at a nurses-station, military style, and evaluated in an assembly line fashion. It is entirely inappropriate for a health care provider to solicit confidential health information that is also deeply personal in a public setting.  Such a military-style processing of patients also would have a chilling effect on patients being forthcoming about their medical histories.

164.   For example, patients were asked to disclose certain information in a public setting, such as whether they had AIDs or other sexually-transmitted diseases like syphilis, suffered from serious mental health issues, thought about committing suicide, as well as numerous other personal physical and mental health questions. Such conduct also likely violated health privacy laws, such as the Health Insurance Portability and Accountability Act of 1996 (HIPAA).

51

165.   In other instances, patients were improperly housed at the facility for hours or even days before a physician evaluated whether they were appropriate for psychiatric care.  Put another way, patients were at the facility without a doctor's assessment or direction for an appropriate plan of care.  Yet, Acadia inappropriately billed for such stays at the facility, in violation of federal and state health care program requirements.  Even more importantly, admitting and keeping patients at a facility before they have been appropriately evaluated by a physician who has determined that such care is reasonable and necessary is harmful to patients.

166.   An essential part of the process of evaluating a patient's appropriateness for behavioral health care at an Acadia facility and to determine a plan of care for the patient is lab testing to analyze a patient's blood and urine.  This is particularly true for patients in need of behavioral or psychiatric evaluation who may be taking drugs, prescription or illegal.

167.   However, Acadia also failed to conduct the medically necessary lab tests for patients at the time of intake on a consistent basis, as required by the health care programs.

168.   Acadia nevertheless had a system to automatically bill the health care programs for laboratory services for urine and blood specimens, regardless of whether samples were obtained from patients, in violation of federal requirements.

169.   For example, Acadia routinely billed the federal and state health care programs for complete blood counts, comprehensive metabolic panels, and a syphilis test for every patient admitted.

170.   However, Relator learned that, although Acadia billed the federal and state health care programs for lab tests as a matter of course at the time of a patient's admission, it was often the case that no blood or urine for lab work was ever drawn from the patient.

171.   If the blood and urine tests were drawn from the patients, it was also common that no clinician at Acadia evaluated the results of the lab work or documented the results.

172.   In other instances, if blood or urine were drawn, there was no documentation in the patient's medical record reflecting the medical interpretation of that lab work.  Thus, the results of any such test could not be useful to another clinician who may later evaluate the patient.

173.   Acadia's failure to draw blood and urine samples from patients typically occurred because there were not enough clinical staff at the facility to take the steps necessary to perform or order the tests, rather than because a doctor decided that the test was not medically necessary.

174.   Still, in other instances, a patient arriving from another health care facility such as an emergency room, often already had blood and urine tests drawn,

53

and clinical interpretations were in the medical record that was transferred to Acadia. Acadia nevertheless billed the federal and state health care programs for tests within 24-48 hours of the patient's referral to Acadia. Re-ordering and billing for tests within such a short time period was medically unnecessary and resulted in improper overbilling.

175. In short, Acadia was grossly irresponsible in its handling of patient lab work at the time of admission. It, however, was systematic in its billing practices to the federal and state health care programs.

176. Also, critical to the evaluation and treatment of patients to facilities, like Acadia, is the evaluation at the time of intake by a trained clinician, such as a physician or a psychiatrist, within 24 hours of admission. In fact, this is mandated by the federal and state health care programs. *See* 42 C.F.R. § 412.27, *et seq*.; GA Drug Regs, Section 111-8-19.13, *et seq*.; GA Mental Health Regs, Section 111-8-68.07, *et seq*.

177. Acadia was inconsistent (at best) in meeting these requirements. It was normal at Acadia for no medical clinician to see or evaluate the patient within the required time frame, or at all. Indeed, physicians were often confused about which patients they were responsible for because assignments of patients to physicians were made during intake without the knowledge of the physician (or the patient for that matter).

178.   To bill the health care programs for services, a "rendering provider" must be assigned to evaluate the patient and provide and approve an appropriate plan of care after reviewing the patient's medical records, which should include lab results and other important medical information.

179.   While Relator was employed by Acadia, only one part-time intake nurse for Lakeview, Nurse 1, assigned patients to physicians upon admission.  As set forth later in the Complaint, Nurse 1's nursing license was suspended at least three separate times due to her own drug and alcohol addiction.  At the time this Complaint is filed, her nursing license is "on probation" until January 2019.  More importantly, Nurse 1 was reprimanded by Acadia for writing admissions orders and assigning patients to physicians, which allowed Acadia to bill for the patients, without obtaining the legally-mandated input or order of the physician.  Yet, she remained employed by Acadia and continued to perform the same work at the facility.

180.   When Acadia staff did notify physicians that they were assigning patients to them for intake, physicians often did not sign a written authorization for the patient's admission until well after the admission date, if at all.   In these instances, Acadia was improperly billing for health care services.

181.   Further, since a physician was usually not present at the facility when a patient was admitted, it was critical that the staff person who performed intake

55

convey any observations about the patient verbally to the physician who would be authorizing the admission and the plan of care.

182.   Too often intake and admission observations about the patient were not communicated to the physician responsible for admitting the patient.

183.   Physician 2, the Service Director at the Georgia facilities, was responsible for about 50 percent of the patients at Lakeview, including most of the adolescents who received Medicaid funding for their services.  For patients who were assigned to him, he was the "rendering provider" under the federal and state health care programs.

184.   Physician 2, however, rarely saw any of his patients, or was rarely involved in their care.  He routinely failed to attend treatment planning meetings for his patients. Treatment planning meetings were held so that clinical staff could discuss admissions and discharge decisions, treatment plans, and the medical progress of patients.

185.   Instead, Physician 2's nurse practitioner (Nurse 2) saw patients on his behalf to the extent she had time.  Nurse 2 acknowledged to Relator that Physician 2 had at best a minimal role in the admissions, treatment, care, or discharge of any of his patients.

186.   Physician 2's consistent failure to care for patients that Acadia assigned to him was well-known by Acadia's high-level executives.  CFO 1 and Med. Dir. 1  made threats to withhold Physician 2's pay checks unless Physician 2 attended peer review or treatment planning meetings for his patients.

187.   Relator is aware of at least one instance when Acadia did withhold payment from Physician 2 because of his failure to attend peer review meetings.

188.   Nevertheless, Relator also observed that Physician 2's complete lack of involvement in patient care at the time of intake, during treatment, and upon discharge continued unabated.

189.   Physician 2 also continued to request that he be assigned large numbers of patients relative to other doctors so that Acadia's billing for these patients could continue, and Physician 2 could be well-compensated by Acadia.  Acadia allowed the continued assignment of large numbers of patients to Physician 2 because it allowed both Acadia and Physician 2 to profit.

190.   Relator is also aware that several other physicians who were "rendering providers" like Physician 2, including Physician 3 and Physician 4, also delegated their non-delegable responsibilities under the federal and state health care programs to nurse practitioners.  Both physicians, although required to conduct evaluations of patients for intake and discharge, and to ensure they were receiving proper evaluation and care, had little to no involvement with their patients at Acadia, which Acadia knew or should have known.

191.   On or about May 5, 2016, one of Relator's nurses, Nurse 3, exchanged a series of text messages with Physician 3 regarding two patients who were assigned to

him at the time of their admission.   Patient A was a 13-year-old boy.  Patient B was a female.

192.   In the texts, Nurse 3 was seeking Physician 3's guidance on significant medical decisions she was about to make for these patients.

193.   Nurse 3 informed Physician 3 in the text that she was trying to reach him by phone to speak with him directly.

194.   However, without any knowledge of the 13-year-old boy's medical history or current medications (if any), without any physical examination of the boy, and without even speaking with Nurse 3, Physician 3 "ordered" (by cell phone text) a combination of potentially addictive chemical substances to restrain the boy.

195.   Specifically, Nurse 3 texted Physician 3 stating, "Need admission orders for 13 y.o. male [Patient A].  No med hx. or meds."

196.   Physician 3 responded, "Usual prns."  The "usual prns," means a drug cocktail of substances to chemically restrain a patient that includes addictive opiate substances.

197.   On that same evening, Nurse 3 had to admit a female patient.  Patient B, as Nurse 3 conveyed to Physician 3 through text messages, "banged her head on the wall and has an abrasion on her forehead" because she was hearing voices.

198.   Nurse 3 asked Physician 3 to provide her guidance (requesting a specific "PRN order") and to authorize 1:1 staffing for the patient.  Again, Physician 3 issued

58

orders (by texting) without any knowledge of Patient B's medical history or current medications, without a physical, and without speaking with Nurse 3 or Relator.

199.   Relator forwarded Nurse 3's text messages with Physician 3 to CEO 1 and Med. Dir. 1, and expressed her concerns about making significant medical decisions about patients through texting.  The text read: "This is how we do dr orders and admissions here???  I feel badly now ab getting so upset with [the part-time intake nurse].  Honestly this calls for an emergency meeting with the Drs."

200.   Relator is aware of no such meeting taking place.

201.   Physician 5, another medical director at the Georgia facilities who was also a "rendering provider" like Physician 2, frequently expressed concern and frustration over inadequate staffing and the lack of physician participation in patient care.  He voiced his objections to executive-level managers at both Lakeview and Riverwoods.  These concerns were similar to the concerns expressed by Relator.  Based on her observations, Physician 5's concerns were not addressed, and nothing at the facilities changed.

202.   Relator can recall another two instances when patients were admitted to Acadia without an admission order, yet Acadia improperly billed the federal health care programs.

203.   Patient C arrived at the Lakeview facility in the middle of the night. Improperly and in violation of law, he was placed in a locked unit without a doctor's order and without a physical or psychiatric evaluation within 24 hours.   On August

22, 2016, Relator informed Acadia management that this patient had been admitted improperly without an admission order and with no intake chart that described the medical history for the patient.

204.   Similarly, Patient D was admitted to the hospital with no order to admit the patient.  Patient D also had been improperly admitted without a physical or psychiatric evaluation within 24 hours of admission.  On August 22, 2016, Relator provided these same facts about Patient D to Acadia upper management.

205.   Patients A, B, C, and D are examples of hundreds of patients admitted to Acadia facilities without the proper physician order, evaluation, plan of care for services they should receive, or the required documentation, in violation of the federal and state health care programs' requirements.

206.   Defendants knew or should have known that their failure to properly admit patients: (a) was not an insignificant, minor or technical violation; b) had a natural tendency to influence the Government's decision to pay the claims; (c) was a violation that went to the essence of the bargain, or health care services to be provided; (d) was something that a reasonable man would attach importance to; and (e) led to the submission of false claims to the federal and state health care programs.

> **b.    Defendants Failed to Properly Plan for and Treat Patients' Psychiatric Conditions.**

207.   In addition to the failure of Acadia to properly admit patients, as extensively

set forth above, Defendants also failed to properly create, revise, or update treatment plans for patients during their time at Acadia.

208.   When treatment plans were created, they were deficient in ways that were detrimental to the care of patients.  For example, treatment plans often did not address or even identify specific criteria necessary for evaluation, such as the patient's physiological, medical, nutritional or dietary, psychiatric, or mental health needs.

209.   To properly administer a treatment plan, behavioral health facilities should form treatment teams that meet with the physicians to discuss patients' individual care and treatment plans, how the patient is doing, next steps, and discharge planning.

210.   At the Georgia facilities, there was little to no development of treatment plans, and minimal nursing and physician participation at treatment team meetings.

211.   Instead, Acadia personnel would meet to primarily discuss the patient census and to ensure that insurance was covering patients' stays during treatment team meetings.

212.   Relator observed that it was rare that the patient's course of treatment or care was discussed during these treatment team meetings, as required by the health care programs, and as appropriate.

213.   Further, physician participation in those treatment planning meetings was minimal, and where physicians did participate, they typically did so by phone.

214.   Acadia management would then separately meet to discuss "flash reports."  Flash reports contained the daily census of patients on service at the facility and were distributed to management and staff.

215.   Through use of the flash reports, Acadia management would make discharge decisions based upon the patient's insurance coverage or eligibility for payment by Medicaid, Medicare, of other federal or state health care programs. Special attention would be paid to patients who received federal and state health insurance to ensure that Acadia was maximizing the number of days to keep patients on service and bill the programs.

216.   Relator is aware of at least three patients for whom the treatment plan was so deficient that it was harmful to the health and safety of the patient.  In each instance, Acadia submitted or caused to be submitted false or fraudulent claims for payment to the health care programs because the required services were not provided.

217.   Patient E was admitted to the Lakeview facility.  Although diabetic, she did not get attention or treatment for her diabetes because Acadia was completely unaware that she was diabetic.  Acadia admitted Patient E with no physician evaluation.  As a result, her medical record did not document her diabetes or her potential for seizures, hypertension, or hurting herself through falls.  Consequently, Patient E remained in the Lakeview inpatient psychiatric facility without being

administered insulin for days, and with no evaluation of behavioral treatments to address or avoid Patient E's tendency for seizures and falls.

218.   Patient F was admitted because she was experiencing delirium.  Patient F was an elderly Medicare recipient who had undergone a heart transplant.  Because she was a heart transplant patient, Patient F needed an anti-rejection medication on a regular basis to avoid organ failure.  At the time of admission, Patient F's daughter and son went to great lengths to make Acadia and certain staff aware of Patient F's fragile medical condition and the necessity for the anti-rejection medication to be properly and timely administered.  Defendants, however, failed to give Patient F her anti-rejection medication in the first two days she was committed to the facility because no physician had seen the patient or ordered the necessary medication.  The drugs were not administered until Patient F notified her daughter, who promptly removed her mother from the facility.

219.   Patients such as Patients E and F complained about serious deficiencies in their plans of care while at Acadia.  Often patients such as these were admitted without seeing a physician during their entire length of stay at the facility.

220.   Defendants knew or should have known that their failure to properly plan for and treat patients' psychiatric conditions: (a) was not an insignificant, minor or technical violation; b) had a natural tendency to influence the Government's decision to pay the claims; (c) was a violation that went to the essence of the bargain, or health care services

63

to be provided; (d) was something that a reasonable man would attach importance to; and (e) led to the submission of false claims to the federal and state health care programs.

### c.      Defendants Failed to Properly Discharge Patients.

221.   As detailed above, Defendants failed to care for patients properly during the admission process in numerous ways and failed to provide proper plans of care and treatment once they were admitted.  Defendants also failed to discharge patients properly and often discharged patients for financial (and not medical) reasons.

222.   Essentially, Defendants' lack of attention to patient care and safety started with intake and followed patients to discharge.

223.   More specifically, Defendants failed to discharge plan properly (or at all) for patients, and, at times, had no knowledge of to whom, where, when or how a patient would be discharged even on the same day the patient was being discharged.

224.   Acadia employed one discharge planner at Lakeview for all patients.  On any single day between 5 to 20 patients might be discharged.  During flash meetings, Acadia's policy was to require a discussion of how patients would be discharged.  Often, however, the discharge planner would respond that she did not know where patients were going, to whom the patient would be discharged, or what care instructions would be provided to the patient's caregiver.

225.   This woefully deficient or complete absence of discharge planning for patients suffering from serious psychiatric and/or substance abuse conditions who may

64

have required treatment and care, including careful and prompt prescription drug administration, allowed Acadia to maintain a revolving door of admissions with those same patients. The revolving door presented Acadia with additional opportunities for further revenue based upon funds received from the health care programs.

226. Health care providers should be planning for a patient's discharge as early as intake. Put another way, the goal for every patient at the time of intake is to evaluate and treat the patient in a manner that provides for eventual discharge. The provider, such as Acadia, is required to document the patient's treatment and progress, keep the patient and the family informed of such, and eventually provide for the patient's discharge.

227. Discharge planning and the discharge process must be administered by and involve a medical professional, such as a nurse or physician, a clinical professional, such as social worker, and attempt to involve family members or loved ones. Moreover, discharge planning should include scheduled follow-up visits and consultations with the patient's health care professionals.

228. Acadia, however, rarely planned for patients' discharge, resulting in improper or inadequate follow-up to check on patient's progress and status of their conditions.

229. Physician 6, who (at times) saw Lakeview patients after discharge, commented to Relator that patients at the Georgia facilities were not receiving the

appropriate services or care they needed, stayed for medically-unnecessary extended periods of time, and were being discharged without medication instructions that would help control or alleviate potentially life-threatening conditions.  In some instances, Physician 6 observed that patients could become worse-off at Acadia.  As a result, she avoided referring patients to Lakeview even though her medical practice was located nearby.

230.   Acadia managers intentionally short-staffed the Georgia facilities (as set forth throughout this Complaint), and the intentionally undersized staff were overwhelmed with responsibilities, including intake and the daily care of too many patients with too few staff.

231.   As noted, most days the patient census was between 60 – 80 patients. Improperly and in violation of the federal and state legal requirements set forth in this Complaint, often only one nurse was available to care for between 15 to 25 patients in a specific unit for a 12-hour shift.

232.   That single nurse was responsible for evaluating, documenting, medicating, and otherwise overseeing the treatment of all patients on that unit.

233.   That lone nurse was also responsible for processing the admission paperwork for patients admitted to their unit.

234.   That one nurse also had the responsibility to perform all the discharge planning for every patient.

235.   Too often, Relator observed that patients would be discharged improperly without medical documentation, including the absence of a discussion about the patients' treatment, progress, or transition to a caregiver or the community.

236.   In some instances, Relator noted that she had not even the most basic information critical to discharging a patient, such as where the patient would be discharged to, or whether someone was responsible for the patient at the time of discharge.

237.   Relator observed that patients were discharged all too often without a meaningful (or any) discussion of the patient's treatment or progress or transition back to the community, without the necessary medical documentation, and without any conversation or update to the family or caregiver for the patient.

238.   Because of Acadia's lack of decision-making processes and inaction, discharge planning was practically nonexistent at Acadia, and certainly not meaningful to the extent it existed at all, in violation of the rules and regulations of the federal and state health care programs.

239.   Defendants knew or should have known that their failure to properly discharge patients: (a) was not an insignificant, minor or technical violation; b) had a natural tendency to influence the Government's decision to pay the claims; (c) was a violation that went to the essence of the bargain, or health care services to be

provided; (d) was something that a reasonable man would attach importance to; and (e) led to the submission of false claims to the federal and state health care programs.

### 2. Defendants Failed to Provide Adequate Physician Oversight or Staffing.

240.   Pursuant to Acadia's policies as set forth above, Defendants failed to sufficiently staff their facilities to provide patients with the quality care required by the federal and state health care programs.  These failures included insufficient numbers of staff, as well as improperly qualified staff and/or staff who could not render the necessary quality of clinical care.  These failures went to the essence of the services that Acadia was paid to provide and should have provided to patients who needed behavioral and psychiatric care.  In fact, the intentionally undersized and unqualified staffing that was a core part of Acadia's plan appeared to be the root cause of most of the other failures set forth in detail in this Complaint.

241.   Medicare and Medicaid require that all necessary services be rendered by appropriate and adequately staffed personnel.  *See* 42 C.F.R. § 412.27(d)(1), (2); *see also* GA Drug Regs, Section 111-8-19-.10(1) (9-2013); GA Mental Health Regs, Section 111-8-68-.05(5)(a).

242.   As noted above, Medicare and Medicaid further emphasize how critical physician involvement is to the care of the patient: "the physician must serve as a source of information and guidance for all members of the therapeutic team who work directly with the patient in various roles."  Medicare Benefit Policy Manual,

Chapter 2 – Inpatient Psychiatric Hospital Services, at 30.2.3 (effective 1-1-2005);
*see also* GA Mental Health Regs, Section 111-8-68.07(2)(b)("A psychiatrist as well
as multidisciplinary professional staff must participate in the preparation of the plan
and any major revisions."), GA Mental Health Regs, Section 111-8-68-.05(3)(a), (b)
(registered nurse must be on duty 24-7 and physician on call 24-7 and at most 60
minutes away).  Put another way, physician involvement in all major aspects of
patient care, as forth in this Complaint, is material to the federal and state health care
programs' decision to pay for these services on behalf of patients.

243.   Many Lakeview patients never saw a physician, even when being
administered significant drugs, in violation of federal and state requirements.  Most
patients admitted at Lakeview had little to no interaction with a physician during their
entire stay at the facility.

244.   Defendants hired physicians and a medical director on a contractual basis.
As a result, each of these physicians had other, outside patients and practices that they
managed and worked at full time.  The work they performed for Acadia was often in
addition to their permanent employment (i.e., they were "moonlighting" at Acadia).

245.   Because Acadia's business plan utilized physicians who were not full time
or part-time employees of Acadia, the physicians were often difficult, if not impossible,
to reach, and Acadia had no control over them.

246.   Patients often complained that they never saw a physician during their time at Acadia.

247.   For those patients who saw a physician, it was also standard practice at Lakeview for patients to be admitted (a) without being seen by a physician within 24 hours of admission, (b) without a psychiatric evaluation within the first 60 hours, and (c) with little to no involvement by a physician in the development of the patient's treatment plan, medical progress, or discharge planning.  See Medicare Benefit Policy Manual, Chapter 2 – Inpatient Psychiatric Hospital Services, Section 30.2 (Effective 1-1-2005).

248.   In those instances when a physician approved the admission, it was standard practice at Acadia for the physician to approve the admission without any independent evaluation of whether the patient needed these behavioral health services, or whether the facility was properly staffed to care for the patient.

249.   With few exceptions, most physicians responsible for patients rarely appeared at the facility to see or evaluate patients, even though Acadia billed and collected payment from the federal and state health care programs for physician care and oversight of patients.  Relator recalls seeing only Physician 2 at Lakeview no more than three to five times during her six-month tenure.

250.    Accordingly, the medical records for patients were largely devoid of information written by the physicians to document their observations, treatment and follow-up recommendations.

251.    Defendants knew or should have known that their failure to provide adequate physician oversight or staffing: (a) was not an insignificant, minor or technical violation; b) had a natural tendency to influence the Government's decision to pay the claims; (c) was a violation that went to the essence of the bargain, or health care services to be provided; (d) was something that a reasonable man would attach importance to; and (e) led to the submission of false claims to the federal and state health care programs.

### 3.    Defendants Billed for Medically Unnecessary Services.

252.    Defendants often kept patients at Acadia (and billed for them) without regard to whether they needed behavioral health treatment, were receiving adequate treatment, or were responding appropriately to treatment, which resulted in Acadia's billing for excessive lengths of stay that were not medically necessary.

253.    At Lakeview, over 50 percent of patients were funded by federal health care programs.

254.    Acadia's treatment of patients was not based on the medical needs of the patients, but instead was based on direction given by Acadia upper management at the corporate level.  To illustrate, Acadia staff were instructed to admit every patient who

71

was eligible for Medicare funding and to keep them on service for as long as possible, because these types of patients were profitable.

255.   Flash reports, which contained the daily census of patients on service at the facility, were distributed to staff daily so they could closely track Medicare patient census.

256.   At an acute behavioral health facility such as Lakeview, patients, on average, would remain on service for three to six days.

257.   Lakeview, however, typically kept Medicare patients on service for at least twelve days and sometimes as many as thirty consecutive days, without regard to the patient's medical needs, treatment needs, or progress.

258.   The month of September 2016 provides a glimpse into how Acadia treated similar-situated patients differently depending upon whether Medicare would cover their stays.

259.   Patient G is one such example.  Patient G was a Medicare recipient. Physician 2 authorized his admission in September 2016 for schizophrenia.  Patient G was on service for at least 18 days.

260.   Acadia also admitted Patient H, another Medicare recipient, for psychosis and depression.  He was discharged only after a 17-day stay at the facility.

261.   Patient I, on the other hand, was not a Medicare patient.  She had private insurance (WellCare).  Physician 2 also authorized Patient I's admission around the same

time.  Like Patient G, she was admitted for schizophrenia; but unlike Patient G, she was also admitted for depression and attempted suicide by drinking detergent.  Yet, because Patient I was not funded by Medicare, she was discharged after only 4 days.

262.   Patient J was also not a Medicare patient.  She had private insurance (Amerigroup).  Physician 2 authorized her admission in September 2016, during the same month as Patients G, H and J.  Patient J was admitted for depression and attempted suicide by overdose.  Not being a Medicare recipient, she was also discharged after four days.

263.   In a review of Acadia's flash reports, the pattern was clear – Defendants consistently discharged Medicare patients only after 12 and 30 day intervals, not because those patients had greater medical needs than recipients of private insurance, but because those time periods triggered the Medicare rules requiring another physician recertification.  *See* 42 C.F.R. 424.14(d).

264.   To ensure that Acadia could maximize billing for Medicare patients, CEO 1 directed intake staff to avoid referring patients to those physicians who did not ascribe to extended stays for patients (even if unnecessary), such as Physician 3.

265.   Relator recalls an instance at a treatment planning meeting when CEO 1 – who was not a physician or licensed nurse — chastised Physician 3 for any clinical decision that led to his discharging Medicare patients before the next Medicare-required certification period.  CEO 1 wanted Physician 3 to allow the patient to stay on service

until Physician 3 had to sign another certification to maximize billing Medicare for the patient.

266.   CEO 1 directed staff to admit any Medicare or Medicaid patient who walked through the door without regard to medical necessity.

267.   Through emails and text messages, CEO 1 further instructed physicians to keep Medicare patients on service for extended lengths of time without regard to physician judgment or medical necessity.

268.   It appeared that on occasion, some Medicaid patients had billing restrictions. Once Acadia could no longer bill Medicaid, it would promptly discharge the patient, even in the absence of physician or licensed nursing judgment.

269.   Defendants knew or should have known that their billing for medically unnecessary services: (a) was not an insignificant, minor or technical violation; b) had a natural tendency to influence the Government's decision to pay the claims; (c) was a violation that went to the essence of the bargain, or health care services to be provided; (d) was something that a reasonable man would attach importance to; and (e) led to the submission of false claims to the federal and state health care programs.

### 4.   Defendants Failed to Maintain Proper Facilities for Patient Care, Including Licensure.

270.   Defendants failed to maintain proper licensure for facilities and staff, as required by Medicare, Medicaid, and certain state laws.

271.   Neither of the Georgia facilities nor certain physicians were properly

registered and licensed to order and administer certain opioid drugs known as Schedule II drugs, including oxycodone, methadone, and morphine, among other drugs.

272.   First, as set forth above, to promote or provide detoxification services, a facility must be registered with certain agencies including, the DEA, the CSAT/SAMHSA/HHS, and the applicable state methadone authority.

273.   Second, in addition to the facility meeting certain requirements, clinicians also must be qualified to provide certain services like administering drugs. For example, a clinician must have special authorization from the DEA (with a DEA number) to write prescriptions for drugs used in detoxification programs, such as OxyContin, methadone and morphine (known as Schedule II substances).

274.   Given the addictiveness of these drugs, prescriptions for them must be in writing.

275.   Specially-authorized physicians must also carefully monitor the use and effect of these drugs on patients.

276.   The Georgia facilities advertise on-line that they offer detoxification services:  Lakeview Behavioral Health, Substance Abuse and Addiction Treatment in Atlanta, Types of Therapy We Use to Treat Substance Abuse, http://www.lakeviewbehavioralhealth.com/addiction; Riverwoods Behavioral Health, Atlanta's Leading Substance Abuse and Addiction Treatment, Types of Therapy We

Use to Treat Substance Abuse, http://www.riverwoodsbehavioral.com/addiction

277.   The Lakeview website specifically advertises the treatment of opiate

addictions as follows:

>The best types of treatment for opiate addiction commonly involve the co-usage of medication and therapies and at Lakeview, we have combined the two into our exemplary treatment center. Medication may be used in the short term after you've detoxed from opioids to manage any lingering withdrawal symptoms and alleviate the stresses you may be experiencing. **Occasionally, medication will be used as a part of your ongoing treatment to address any mental illnesses that you may be struggling with. Medication usage and duration will be decided by you and your treatment team.**

Lakeview Behavioral Health Website, "Types of Therapy We Use to Treat Opiate

Addictions," (accessed April 5, 2017)

http://www.lakeviewbehavioralhealth.com/addiction/opiates (emphasis added)

278.   The Acadia website further acknowledges:

>**[S]ymptoms of opioid withdrawal are often treated with medications such as methadone, Suboxone, Subutex, and Vivitrol**, while individuals who are withdrawing from alcohol may benefit from certain prescription benzodiazepines. Of course, the specific medications that may be incorporated into any individual's detox treatment will be determined by consultation with the members of his or her treatment team at the program where he or she receives care.

Acadia HealthCare Website, "Drug and Alcohol Addiction Detox Services," (accessed

April 5, 2017), http://www.acadiahealthcare.com/programs-and-services/detox (emphasis

added).

76

279.   To Relator's knowledge, Lakeview is not properly licensed to provide detoxification services for opiate addiction, despite its marketing and offering of services.

280.   Further, physicians at the Georgia facilities would improperly order prescriptions for Schedule II substances <u>verbally</u> (over the phone), instead of in writing most of the time.

281.   When Relator confronted Med. Dir. 1 about this serious violation, Med. Dir. 1 confessed that he was not aware that Schedule II narcotics required a written prescription.  Despite Relator's warning that physicians should not verbally order these drugs by phone, physicians at the Georgia facilities continued to call in orders verbally.

282.   Acadia allowed a part-time nurse, whose license had been suspended more than once for drug diversion, to admit patients without any physician consultation, and to routinely request an order (known as a "PRN") for a cocktail of drugs, including Schedule II drugs, which acted as a chemical restraint.  The PRN ("pro re nata") also allowed serious and addictive drugs to be administered improperly at the patient's request *or at a nurse's discretion* (by checking a box) for certain psychiatric symptoms.

283.   A nurse cannot order a PRN in her own discretion under the requirements set forth by the DEA, SAMSHA, and other federal rules governing

Schedule II drug disbursement, particularly ones that act as a chemical restraint.

284.   Moreover, because patients often were not properly assessed at intake, the patient's physiology or other drug contraindications were often not evaluated prior to the issuance of a PRN order.  As a result, ordering a chemical restraint without evaluating these factors was highly dangerous to patients, particularly adolescents.  For example, a PRN administered to an adult male to subdue him for 6-8 hours would subdue an adolescent boy for 12-16 hours, twice the time of an adult male.

285.   Relator informed non-medical executives at Acadia that Lakeview's routinely-administered PRN should not include Schedule II chemical restraints, and that the practice of standardization in administering drugs to patients without individual evaluations was inappropriate for the reasons set forth above.  Relator's efforts to stop these practices were ignored.

286.   For example, Relator raised these issues with Exec. Dir. 1, Executive Director of Clinical Services at Acadia (and a former Chief Nursing Officer at another Acadia facility, Greenleaf Behavioral Health Hospital).  She urged Exec. Dir. 1 to halt ordering standard PRNs for patients, citing patient-safety concerns.  While Exec. Dir. 1 acknowledged that Relator raised valid concerns, the practices were not ended.  In fact, the intake nurse described above (Nurse 1) who had had her license suspended more than once for drug diversion continued to order chemical restraints

on her own without a doctor's order at the time of a patient's admission.

287.   Relator raised the same concerns about this routine practice with Med. Dir. 1.  He acknowledged that Nurse 1 needed to "get out of here" and reassured Relator that the situation at the Georgia facilities "was going to get better."  Nurse 1, however, continued to admit patients, write orders for Schedule II drugs, and perform intake functions at Lakeview.

288.   Relator observed other serious facility-related deficiencies at Lakeview. For example, the facility did not have an infection control plan.

289.   Acadia also failed to make available necessary foods and nutritional supplements to address the patients' dietary or nutritional needs.  For example, there were no diabetic-appropriate snacks for diabetic patients.

290.   There was no housekeeping staff at the facility after 5:00 p.m. to sanitize or disinfect the rooms or shared spaces, which created an unhealthy environment.

291.   In the adolescent unit at the inpatient facility, there was no space to physically restrain adolescents when necessary.  As a result, adolescents were transported to an adult restraint-unit when they acted-out.  To restrain patients during transports, a stretcher was the safest mode of transport.  However, inexplicably, the facility lacked stretchers.  As a result, adolescent patients were transferred by physical force by small groups of technicians or staff – a dangerous situation for both patients and staff.

79

292.   Federal and state law governs the use of restraints in behavioral health facilities, and the practice is highly regulated because of the seriousness of the act both physically and psychologically. *See* 42 C.F.R. 483.358; GA Drug Regs, Section 111-8-19-.26. In particular, laws require that a physician or licensed practitioner trained in the use of emergency safety interventions write an order for the restraint or seclusion, the restraint be limited in duration depending on the age of the patient, and within one hour of the restraint's application a physician or licensed practitioner trained in the use of emergency safety interventions engage in a face to face assessment of the patient's physical and psychological well-being.

293.   Despite the clear federal and state mandates governing the use of restraints in behavioral health facilities, Acadia rarely had a written order from an appropriate clinician in the patient's medical record for the use of restraints, and the requirement for a face to face assessment of the patient by an appropriate clinician was disregarded.

294.   All of these facility-related deficiencies resulted in significant patient risk, likely harm, and poor-quality care for patients.

295.   Defendants knew or should have known that their failure to maintain proper facilities, including licensure: (a) was not an insignificant, minor or technical violation; b) had a natural tendency to influence the Government's decision to pay the claims; (c) was a violation that went to the essence of the bargain, or health care services to be provided; (d) was something that a reasonable man would attach

80

importance to; and (e) led to the submission of false claims to the federal and state health care programs.

### 5.   Defendants Intentionally Falsified Documents in Response to Government Inquiries, Audits or Investigations.

296.   During Relator's employment at Acadia, the state of Georgia, in conjunction with CMS, investigated complaints made by patients and their families. On more than one occasion, patients filed habeas corpus petitions alleging that they were improperly or illegally detained at the psychiatric facility or restrained against their will.

297.   More than once, Relator observed patients being improperly restrained without a physician's order and for extended periods of time.  If questioned by an outside authority, however, Acadia would deny patients were restrained.

298.   In addition to denials, Relator also observed Defendants take other actions to hide certain Acadia practices.

299.   When investigating a patient's complaint, investigators typically arrived on site and requested to review medical records from the same unit where the patient resided, in addition to the complainant's medical records.

300.   Lakeview's then-Risk Manager (who was promoted to Director of Nursing after Relator was terminated), Risk Mgr. 1, was responsible for compiling the relevant documents, including written policies and the complainant's medical

records, for the investigators.

301.   Before turning over the documents, Risk Mgr. 1 often reviewed the medical records to determine if they were missing information, such as physician's orders, medical notes, or physicians' signatures.

302.   In some instances, if physicians had not signed certain records, including treatment plans or restraint orders, Risk Mgr. 1 would shred the unsigned documents and inform the investigator that she could not locate the missing documents.

303.   It was apparent that Risk Mgr. 1 took certain actions to avoid the appearance that doctors were not involved in the necessary patient care, or that federal requirements were being violated.

304.   At other times, Risk Mgr. 1 was deceptively selective about the medical records she provided the investigators for review.  For example, she knew that certain physicians, such as Physician 2 failed to evaluate patients or sign orders directing patient care.  As a result, Risk Mgr. 1 would avoid providing investigators the medical records for patients assigned to Physician 2, who as noted above rarely saw his Lakeview patients.  On the other hand, if a doctor was typically more responsible about providing patient care, Risk Mgr. 1 would turn over to investigators the medical records of patients assigned to those physicians.

305.   Notwithstanding the fact that Defendants knew or should have known that Risk Mgr. 1 was destroying relevant medical records of patients and deceptively

82

responding to investigators' inquiries, they nonetheless promoted her from Risk Manager to Director of Nursing (Relator's former position).

306.   Relator also learned during state or CMS investigations that Defendants instructed nurses to identify critical documents in patients' medical records that were missing signatures, such as doctor's orders for treatment and care, and to recreate those records or have the physicians sign them before they were produced to CMS or the state investigators.

307.   During one state investigation, Relator asked nurses to audit every chart on the unit in preparation for an on-site review the following day.  The nurses informed Relator that there were new forms not previously seen by the nurses that someone had placed in the patients' charts.

308.   Relator later learned that an employee-technician, acting on instruction from CEO 1, placed three new forms into numerous patients' charts without Relator's knowledge.  Among the forms were certain documents required by the health care programs, including discharge treatment plans.

309.   Relator also came to understand that physician signatures were back-dated to make the records appear contemporaneous with the care of the patient, even though the record may never have existed at the time of care, or was only reviewed and signed by a physician weeks or months after the patient received services and after Acadia submitted claims to the federal program on the patient's behalf.

310.   Relator called CEO 1 to express her serious concerns about this issue. CEO 1 told her to "calm down" and asked Relator to "call all nurses at 9 PM and tell them to change the charts."  Relator understood this to mean that she and the nurses should reverse-engineer the wrong that had been done.  Relator told CEO 1 that she would not do that and she would not ask her nurses to do that.

311.   As documented in an email described further below, Relator wrote: "They [the nurses] had already gone through most of each chart flagging for signatures and making sure they look good from a nursing perspective.  The answer should not be for me to fix it when I was not the cause of problem and neither were my nurses.  I do not feel that [CEO 1] is addressing my concerns with any seriousness.  She laughed at me tonight . . . ."

312.   Relator further stated in the email that her "ethics are being compromised because it is not possible for me to comply."

313.   On May 25, 2016, Relator emailed the Lakeview Director of Human Resources (Dir. HR 1) to report all this conduct and to express serious concerns that medical records were being altered or fabricated in response to a state or CMS investigation.

314.   Relator came to later learn that management intentionally excluded her from participating further in these investigations because they knew she would voice her same objections and not follow-through on what she believed to be improper

84

directives from CEO 1.

315.   Further evidence that Defendants knew (or should have known) that the violations set forth in this Complaint were not only material to the Government's decision to pay, but also fraudulent, is that Defendants took these steps to cover their tracks.  By fraudulently doctoring medical records when regulators conducted inspections or reviews of their operations, Defendants were knowingly preventing officials from learning that they were violating certain laws, which were material to the Government's decision to pay claims.

### 6.   Defendants' Admissions Decisions May Have Been Improperly Motivated by an Unlawful Kickback Scheme.

316.   It appears Defendants may have admitted patients who did not need behavioral health services due to kickback arrangements Defendants had with referring providers, including local hospitals, nursing and assisted living facilities, and physician providers.

317.   Relator was aware that Acadia had negotiated arrangements with local hospitals to admit all patients where an emergency-room doctor had issued an order called a "1013-order."  In Georgia, a 1013-order is a request that an individual be evaluated at a psychiatric facility.

318.   Rather than evaluate every patient referred by a 1013-order, Relator observed that Acadia admitted every patient referred by a 1013-order without regard

to medical necessity or whether Lakeview had sufficient staff to care for the patient.

319.   Defendants knew or should have known that paying kickbacks to receive referrals: (a) was not an insignificant, minor or technical violation; b) had a natural tendency to influence the Government's decision to pay the claims; (c) was a violation that went to the essence of the bargain, or health care services to be provided; (d) was something that a reasonable man would attach importance to; and (e) led to the submission of false claims to the federal and state health care programs.

C.    **Defendants *Knew or Should Have Known* Their Conduct was Leading to the Submission of False Claims.**

320.   Defendants knew or should have known of their obligations to patients under federal and state requirements designed to protect them.

321.   As providers of health care funded by federal and state governments, Defendants were obligated to be very familiar with, and knowledgeable of, federal and state health care program payment requirements for patients entrusted to their care who were entitled to receive inpatient psychiatric and outpatient behavioral health services. That included knowledge of when such care was appropriate, medically necessary, and properly documented.  Defendants were required to "turn square corners with the Government."

322.   Defendants acted with actual knowledge, deliberate ignorance, and/or reckless disregard of the laws, regulations and guidance applicable to federal and state health care programs when they prioritized profit over patient care.

323.   More specifically, as set forth in this Complaint, rather than develop, implement, and sustain safe and sound policies and practices to ensure patient safety and care, Defendants knowingly flouted federal and state requirements.

324.   Defendants knew or should have known these systemic and continuous failures would lead to patient harm.

### 1.    High-Level Executives Knew or Should Have Known of the Severe Staffing Shortages.

325.   Defendants knew or should have known that Acadia facilities were severely deficient in violation of federal and state requirements.  Specifically, Defendants failed to properly admit patients, plan for or treat patients' psychiatric conditions, discharge patients, medicate patients, or maintain or provide adequate staffing or facilities. Defendants' abysmal failure to provide sufficient, qualified staffing and oversight in the care of these patients, led to many of these other failures.

326.   Documents show that high-level executives had knowledge of these failures. To illustrate, Exec. Dir. 1 wrote to Relator and others at the Georgia facilities after a visit by state officials in September 2016, acknowledging the need for corrective action, although there was little to no follow-through:

> Education on the Notification Processes for the AOC [Administrator on Call] when there is a fall with injury, seclusion/restraint, etc (add to annual and orientation education).  **Do your AOCs know how to respond when a provider doesn't respond to staff calls, when there is an event that the patient is injured?;**
> \*\*\*

Patient Assessment and Reassessment after a status change
such as a fall with injury, especially if the fall involves the
head;
***
**Implementation of MD orders timely.  This begins with
notation of orders.  If the orders are not noted for several
hours: care may be delayed.**  This is a process you may want
to look at when you are reviewing your staffing models.
***
**Importance of documentation the details of care provided.**
Documentation should reflect the treatment plan goals and
implementation of interventions, patient observation and
precaution orders, and assessment/reassessment findings.

Many of the same problems identified by Relator were acknowledged by Acadia

executive-level managers during this time.  However, while they appeared concerned

about the problems during state surveys, they did not advocate that processes or staffing

be amended to address the problems.  And ultimately, nothing changed.

327.   Further, in a particularly telling admission by Exec. Dir. 1, having only a

single registered nurse care for all patients in one unit created quality of care issues:

Staffing model being more specific regarding the staff mix
versus staff numbers.  The surveyor was focused on the number
of nurses available to provide patient care.  Make sure staff
know who their resources are: such as the charge nurse (nurse
supervisor).  **This is especially true if a unit has one RN to
assess patients, provide care, administer medications, note
orders, etc.  If a patient has a status change or there is an
emergency who is available to help?**  What happens when the
charge nurse (nurse supervisor) is assigned to a unit?  Look at
your plans and make sure they are specific without being
restrictive.

(emphasis added).  Thus, while state surveys highlighted serious deficiencies in staffing and quality of patient care, and inadequate clinical documentation, Acadia did not take steps to use its financial resources to fund additional staff that could mitigate or prevent recurring problems.

328.   High-level executives at Acadia knew or should have known that the staffing deficiencies and problems at certain of its facilities were detrimental to patient health and safety.  In fact, these problems were identified and discussed at meetings of the governing board for the Georgia facilities.  Quarterly meetings of the governing board often included several or more of the following participants: Acadia Corporate Vice President of Regional Services (Corp. VP 1), Riverwoods CEO (CEO 2), Riverwoods CFO (CFO 2), as well as CEO 1, CFO 1, Med. Dir. 1, and Reg. VP 1.

329.   On June 29, 2016, all these individuals were present at a quarterly governing board meeting for the Georgia facilities, as shown by documents.  At that meeting, these high-level executives were made aware that critical medical and clinical staff responsible for patients were not participating in treatment team meetings, medical and clinical information was not being documented properly for patients, and these problems required prompt attention to allow patients to remain on service and Acadia to continue to bill the health care programs.  However, the focus of the meeting was on getting staff to take the necessary steps to ensure continuity of service and billing, rather than on sufficiently qualified patient staffing and care.

330.   One document shows that the governing board discussed "new strategy for treatment team: all members of the patient's team attends either in person or via phone to include auxiliary services," and the appointment of "two managers [to] go through every chart on Monday mornings to ensure doctors have updated medical and clinical information from the weekend in order to reduce number of discharges on Monday."

331.   Despite recognition that relevant personnel were not attending treatment team meetings, physicians remained absent from these meetings.

332.   Further, instead of focusing on addressing patient diagnoses and treatment, a decision was made at the governing board meeting to instruct clinical staff to prioritize patient insurance information during clinical meetings to avoid the problem of patient discharges on Monday.  Discharges, of course, lead to less billing opportunities for Acadia.

333.   Acadia employees and staff at every level—executive directors, chief executive officers, medical directors, licensed nurses, and clinical staff observed inadequate staffing levels and complained to Defendants.  Family members of patients also reported inadequate staff.  All these concerns were ignored.  Simply put, Defendants put cost-cutting measures over patient care and safety, time and time again.

## 2. Defendants Took Affirmative Steps That They Knew or Should Have Known Contributed to the Seriously Inadequate Staffing.

334.   What's more, Defendants took certain affirmative actions that they knew or should have known contributed to the unacceptable staffing shortages.

335.   First, Acadia's executive management directive was to cut costs by keeping staff to an unsafe minimum.  Reg. VP 1 and Acadia Regional Chief Financial Officer (Reg. CFO 1) visited certain Georgia facilities in the summer of 2016, and demanded that costs be cut.  They insisted that the best way to cut costs was to reduce the number of full time employees on duty and/or to simply fire others.  Shortly after this visit, Acadia put in place a hiring freeze.

336.   Reg. VP 1 and Reg. CFO 1 met with Relator and other management at the Georgia facilities numerous times and reiterated at each meeting the need to control expenses by reducing staff.  Both Reg. VP 1 and Reg. CFO 1 knew or should have known that the reduction in staff would further aggravate the other problems at the facilities:  the failure to properly admit patients, plan for or treat patients' psychiatric conditions, discharge patients, and medicate patients.  Again, Defendants' continuous failure to provide sufficient, qualified staffing and oversight of patients led to many of these other failures.  It was a cascading waterfall.

337.   Often, executives ordered managers to send on-duty staff home to avoid

paying them, regardless of whether the facility had the appropriate number of clinical staff.

338.   Second, Acadia managers hid their staffing ratios from outsiders to avoid scrutiny.  Documents show that managers were aware of the importance of specific staffing ratios.  Yet, they knowingly prevented the dissemination of staffing grids and ratios to avoid discovery by state and joint commission surveys.

339.   Typically, at the Georgia facilities staffing ratios were as follows: on the adult units, the staffing ratio was one nurse for every 15-20 patients and on the adolescent units, the staffing ratio was one nurse for every 15-25 patients.  While Defendants tried to fill in the ratio with non-licensed technical staff including medical health aides or MHAs, those personnel had limited to no medical training and could not perform the same services or provide the same care as a nurse.  These nurse-to-patient ratio numbers are unacceptably low and created an unsafe environment for the patients.

340.   Third, non-clinical staff made financial decisions about staffing without regard to clinical need.  For example, every morning, Relator and Lakeview's patient coordinator (PC 1) were expected to email high-level executives (CEO 1, CFO 1, and Acting Riverwoods CEO (CEO 3)) their staffing numbers.   Non-clinical executives would then make financial decisions about how many staff to keep or send home

without any discussion of clinical need or patient-staff ratios.  Below are some specific examples.

341.   On August 23, 2016, CFO 1 suggested that patients be confined to their rooms to get around the required 1:1 staff ratio for certain patients. Relator responded that "[t]echnically we cannot force them to stay in their rooms – that is a restraint."

342.   On August 24, 2016, CEO 1 declined Relator's request for appropriate staffing to accommodate (in part) a doctor's order.  Specifically, at 10:00 a.m., based on the mandated-protocol to obtain staffing approval from the business people, Relator notified CEO 1, CFO 1, and CEO 3 that Med. Dir. 1 had requested that a certain patient receive 1:1 staffing attention.  To follow the doctor's order, Relator proposed a specific plan to address the medical and clinical needs of all the patients. She asked whether she could shift staff around to cover this 1:1 medical request, to allow at least two nurses and two non-clinical technicians (staff who help nurses to control patients) on specific floors, and allow the licensed nurse to leave early only if there were "a lot of discharges." CEO 1 refused to accommodate the request: "No – we are trying to do expense management.  An RN or [the licensed nurse] needs to go now."

343.   On August 31, 2016, CEO 1 ordered Relator to send home a nurse on the adolescent unit.  Relator's objection to an adolescent-nurse ratio of 18-1 as highly

inadequate was discounted.  Relator responded, "I disagree that adolescent [unit] does not need another nurse.  [Nurse] went home early, and adolescent [unit] has 17 patients with one on the way.  I just want to go on the record again stating that I do not feel adequately staffed with so few nurses for so many patients."

344.   Once again, on September 18, 2016, Relator informed high-level executives that the adolescent-staff ratio was 1-26 for that day.  Relator's concerns continued to be ignored.  At 7:45 a.m., Relator received a text message from a nurse stating, "Good morning.  I came to work today and this was not my originally scheduled day.  Since one of my co workers called out, I have to work by myself with 26 kids.  That is unfair to me.  Please call me back in regards to this matter."  Relator immediately reported that message to Acadia management including CEO 1, CFO 1, and CEO 3.

345.   Instead of responding to Relator's well-founded concerns, Defendants terminated Relator days later.

346.   Time and time again, Relator notified management about the staffing shortages at Lakeview.  Each time, management disagreed that additional staff was needed.

347.   This interference by business people with medical and clinical decision-making was unlike what Relator experienced as a nurse-in-charge at other health care providers.  As the Director of Nursing, Relator should have been responsible for

assessing daily staffing needs based on the patient census and patient behavioral and mental acuity.

348.   Executive-level managers making financial decisions about staffing helps to explain a root cause of Acadia's failures to properly admit patients, plan for or treat patients' behavioral and psychiatric conditions, discharge patients, medicate patients, and maintain or provide adequate staffing or facilities.

349.   In short, high-level Acadia managers knew or should have known that patient harm could result when they cut staffing to control expenditures without regard to patient census or behavioral and mental acuity as determined by a physician or other qualified clinical staff.

350.   Third, Acadia staffed units with technicians instead of statutorily-mandated medical and clinical professionals such as nurses.

351.   Technicians are non-clinical staff who have little to no clinical experience or education.  While necessary and helpful, their role should be very limited.  Technicians primarily can help with physically controlling patients, and they should act at the direction of nurses.  Only nurses—not technicians—should admit and discharge patients and administer medication.

352.   By corporate directive, Acadia improperly counted staffing ratios by including all staff on the unit – not just medically and clinically licensed staff – but also technicians.  Acadia frequently cut, fired or sent home supervisory and clinically

95

licensed staff such as nurses-in-charge (charge nurses), registered nurses, and licensed professional nurses to maintain only a single nurse per unit.

353.   For example, units known as the most acute medical and mental health units at the facility ("the third-floor units") were sometimes grossly understaffed.  On September 13, 2016, Defendants staffed one LPN for 25 adolescents with 2 "on the way" during the day and one RN for 27 adolescents at night.   Defendants staffed one licensed practical nurse (LPN) for 25 adolescents.  For the less acute adult units on the second floor, there was one nurse for 16 patients and one nurse for 18 patients, respectively.  Because each unit had at least two or three technicians, in addition to a single nurse, Acadia corporate improperly characterized the staffing ratio as one staff per 5 to 6 patients (1:5/6).

354.   On September 13, 2016, the patient census at Lakeview was 78 with 19 admissions and 19 discharges on that day.  In addition to evaluating and administering medication for all 78 patients, only four nurses were responsible for admitting and discharging 28 patients in that single day.

355.   Under the corporate directive, if the staffing ratio was around 1:4 (1 staff person for every 4 patients), Acadia deemed the ratio too high, irrespective of the number of clinical (versus non-clinical) staff.

356.   Reg. CFO 1 wrote CEO 1 that a staffing ratio of 1 to 3.5 is "very high" and further wrote:

> [y]ou have 1 LPN covering 3N and 3S for 29 patients . . . the
> 2 RNs should be able to cover.  You also have 1 LPN on 2N
> and 2S for 29 patients . . . the 2 nurses should be able to
> cover.  If we exclude the 1:1s and send the 2 LPNs home we
> are at a ratio of 1 to 4.92 which is much better.  On top of
> this very high staffing we have the charge nurses and a nurse
> manager . . . we have to be extremely tight with all these
> FTEs [full time employees] when census dips into the low
> 60s.

In short, Reg. CFO 1 instructed CEO 1 (neither of whom is a physician, licensed practitioner, or nurse) to staff only two registered nurses (RNs) for 58 patients, and further instructed that the two LPNs be sent home.  Instead of sending the lower-paid and less-qualified technicians home to keep the licensed nursing staff available, CFO 1 instructed that the higher paid, more qualified staff be sent home.

357.   Such communications from business executives to cut qualified staff to save money were sent to staff who were responsible for daily patient care.  Defendants knew or should have known that such cost-cutting measures would (and did) detrimentally impact quality patient care.

358.   Fourth, Acadia's business model put the company on a trajectory to prioritize financial growth at the expense of quality care.  Its goal has been to acquire hundreds of behavioral health facilities across the country but put highly inexperienced staff in the role of managing those facilities.  It has been successful in achieving these goals, but at the expense of patient care and the taxpayer-funded Medicare and Medicaid programs.

359.   In less than two years, Acadia acquired over 500 facilities.  Its profit on federally-insured patients grew by over 600 percent.

360.   Acadia put startlingly-inexperienced individuals in highly-responsible positions with the promise of big promotions and financial incentives to grow the company.  While these individuals appear to have college degrees, based on the evidence described above, they typically lack the background to run a psychiatric facility that is responsible for patients with serious behavioral and mental health issues, in an organization entrusted with managing hundreds of millions of taxpayer-funded dollars.

361.   At the Georgia facilities, Acadia executive-level managers had little to no experience in executive positions.  Acadia hired CEO 1 when she was in her late twenties with a social work degree as Lakeview's Director of Intake and Utilization Review.  Within a year, Acadia promoted CEO 1 to CEO in March 2016.

362.   Acadia similarly hired CEO 3 in his mid-twenties as an intern in 2015, after he graduated with a Masters of Business Administration degree that same year.  By August 2016, he was a CEO in training and in February 2017, Acadia promoted him to CEO of Riverwoods.

363.   Acadia touts itself on its website as follows: Acadia Healthcare's behavioral health treatment facilities are specialized in helping children, teenagers, and adults suffering from mental health disorders and/or alcohol and drug addiction.

98

364.   Notwithstanding that both Lakeview and Riverwoods are psychiatric hospitals that offer inpatient and outpatient services to hundreds, if not thousands, of patients, Acadia did not hesitate to put two individuals with little work (or world) experience in the roles of Chief Executive Officers.

365.   It appears that Defendants' ambitious financial goals—while realized—have had potentially serious health and safety consequences for patients, as Defendants knew or should have known they would.

### 3.      High-Level Executives Knew or Should Have Known That Intentionally Slashing Staff Could Lead to Patient Harm.

366.   Not surprisingly, Defendants' failure to properly admit patients, plan for or treat patients' psychiatric conditions, discharge patients, medicate patients, and maintain or provide adequate staffing or facilities led to actual patient harm.  Relator is aware of several patients who suffered serious harm.  Examples are set forth in this Complaint.

367.   Lakeview admitted Patient K, an active duty Air Force member.  The patient ran away from the Lakeview facility on September 8, 2016.  Accordingly, the patient's doctor (Physician 7) ordered that the patient should have 1:1 supervision.  CFO 1 asked whether "unit restriction" would keep the patient from running away again.  Relator informed CFO 1 that under Physician 7's order, Patient K was not to be restrained or placed on unit restriction.  However, CEO 1 informed Relator that

she had called Physician 7, who purportedly authorized unit restriction instead of 1:1 supervision.  At the same time, CFO 1 ordered Relator to send home a staff member. With this insufficient staffing, Patient K fled the facility again, stole a car, and crashed it into another car.

368.   Patient L, who was diagnosed with dementia, was repeatedly admitted at Lakeview.  Relator understood that Patient L was a disabled Medicare beneficiary. Each time Patient L was admitted to Lakeview, it was unclear to Relator what psychiatric or substance abuse problems Acadia planned to treat.  Because of the inadequate staffing, Patient L wandered off his unit without anyone noticing.  Hours later a staff member who opened the large cafeteria refrigerator found Patient L stuck inside.

369.   Patient M was a child in the custody of the Division of Child and Family Services and a Medicaid recipient.  Patient M was admitted to the inpatient acute adolescent unit.  For 12-hour periods, a single nurse was the only clinician caring for the adolescents.  During the same time, Acadia admitted another adolescent (Patient N) who purportedly molested a sibling and was labeled a sexual deviant at the time of admission.  Relator learned that Patient N raped Patient M while both were in the care of the Lakewood facility.

370.   These examples of patient harm were a predictable and direct result of

100

Defendants' deliberate decisions to provide insufficient staffing and quality of care.

371.   Based on Relator's communications with Acadia's Reg. VP 1 and other information provided to Relator by Acadia representatives and/or observed by Relator, Acadia's business model apparently is to employ the same practices of deficient staffing and inadequate care at its facilities overall. Defendants knew or should have known that patients were similarly endangered or harmed, and that similar violations occurred, at other Acadia facilities.

372.   Indeed, another local psychiatrist commented to Relator that Acadia's Blue Ridge, Georgia facility was atrocious due to many of the same problems Relator observed at Lakeview and Riverwoods.

373.   Defendants further knew or should have known that the claims and certifications that they submitted, or caused to be submitted, to the federal and state health care programs were false or fraudulent.

### 4.   The Staffing Levels Were So Deficient They Appear to Have Contributed to at Least One Patient Death.

374.   Defendants knew or should have known that the failure to have adequate numbers of medical and clinical staff to care for patients and address the serious psychological and medical needs of this patient population would threaten the safety of patients.

375.    The Joint Commission, the nonprofit organization that accredits thousands of health care organizations and programs in the United States, sets forth certain standards for facilities such as Acadia's.  One such standard directs how certain events that cause risk to patient safety and health—called sentinel events—should be handled by the health care facility.

376.    The Joint Commission defines a sentinel event as "an unexpected occurrence involving death or serious physical or psychological injury, or the risk thereof."  As further described, "[s]uch events are 'sentinel' because they signal the need for immediate investigation and response."

377.    Further, sentinel events require an immediate investigation that primarily involves a root cause analysis, described as:

> a process for identifying the factors that underlie variation in performance, including the occurrence of a sentinel event.  A root cause analysis focuses primarily on systems and processes, not on individual performance.  The analysis progresses from special causes in clinical processes to common causes in organizational processes and systems and identifies potential improvements in these processes or systems that would tend to decrease the likelihood of such events in the future or determines, after analysis, that no such improvement opportunities exist.

The Joint Commission, Sentinel Events (2012)

https://www.jointcommission.org/assets/1/6/CAMH_2012_Update2_24_SE.pdf.

378.   The death of Patient O at Lakeview while Relator worked there was one such sentinel event that Relator reported as such.  However, Defendants did not appropriately respond or investigate, although they knew or should have known that the failure to do so was a violation of federal and state health care program requirements, and threatened the safety of patients under their care.

379.   Patient O was admitted to Acadia as suicidal and depressed, but was admitted to the detox unit at Lakeview – not the psychiatric unit where she should have been admitted.  While at Acadia the patient was verbally expressing suicidal thoughts with a flat affect over the course of a week.  As a result, Relator believes the patient should have been given 1:1 staffing attention.  Patient O was on a unit with 18 other patients.  Only a single registered nurse was on duty to dispense medication to, and otherwise care for, all 18 patients over the course of a 12-hour overnight shift, and that nurse understood these patients to be in detox/substance abuse recovery – not patients suffering from serious psychiatric conditions like suicidal ideation.  Nonetheless, that kind of staffing level is dangerous for all patients on the unit.  During the evening, Patient O was having difficulty breathing and was not provided the immediate medical attention that she should have been provided.

380.   A staff person is expected to go into each patient's room every 15 minutes during the evening to check that patients are breathing.  These are known as "Q15 checks."  On the evening that Patient O was having trouble breathing, the staff person

assigned to perform Q15 checks fell asleep instead of performing the required Q15 checks. After an hour and a half of not having a Q15 check, Patient O was found unresponsive and blue in appearance. Patient O was transferred to Gwinnett Medical Center and pronounced dead that same evening.

381.    Relator immediately fired the staff person who fell asleep and others who were on duty that evening. Relator also wrote to Risk Mgr. 1 that Relator believed poor staffing at the facility led to the patient death. Risk Mgr. 1 disagreed. She responded that it was reasonable for one nurse to manage as many as 20 patients.

382.    Upon receiving this lackadaisical response, Relator also promptly reported this incident to Exec. Dir. 1 by email. Relator relayed to Exec. Dir. 1 her view that the root cause of the problem that led to the death of Patient O was that only a single nurse was responsible for 18 patients during a 12-hour shift in an acute medical unit. Relator further explained to Exec. Dir. 1 that, while the on-duty nurse was a qualified registered nurse, neither she nor any other single clinician acting alone, could have properly cared for 18 patients, particularly given the limited resources that Acadia made available.

383.    After relaying this information, Relator specifically asked Exec. Dir. 1 how to handle the situation, particularly repeating her concern that the inadequate staffing would continue to lead to patient harm. Exec. Dir. 1 never responded to Relator's email. Instead, Relator heard from Med. Dir. 1 and Reg. VP 1. They reported to Relator that Exec. Dir. 1 had forwarded Relator's email to other Acadia corporate officers, which

allegedly "really caused some drama."  In response, Med. Dir. 1 told Relator that she needed to "knock it off" and "calm down" because "you can't change everything in a day."

384.  Defendants' failure to provide adequate staffing and quality patient care led to the death of a patient.  Defendant knew or should have known that staffing an 18 patient-unit with one licensed professional was grossly inadequate medical care and not the appropriate level or quality of care required by the federal and state health care programs.

**D.     Compliance with the Relevant Laws Was Material to the Government's Decision to Pay Because They Went to the Essence of the Services to be Provided by Acadia.**

385.   Defendants' violations of the federal and state health care program requirements set forth in detail in this Complaint go to the heart of the services required to be provided and that Acadia was being paid to provide.  Acadia is a Medicare, Medicaid, TRICARE, and other federal health care provider of inpatient and outpatient behavioral health and addiction services to its patients.  On its website, Acadia claims that its "expertise in behavioral health allows us to provide the highest standard of treatment allowing recovery for the individual and their families."  Acadia's provision of appropriate medical services and care is intrinsic to the Government's decision to pay Acadia for these services.

386.   As repeatedly pointed out in this Complaint, Defendants' systemic and

widespread failures to provide quality care to patients and sufficient staffing numbers went to the essence of the services (and of the bargain) for which the Government was paying claims.

387.   Defendants' failures and violations were serious and material, leading to actual or potential patient harm, and not merely technical or minor infractions of rules.  In many instances set forth in this Complaint, Defendants' violations were with actual knowledge of the seriousness of their violations, and not simply a case of a defendant acting with reckless disregard.

388.   The services Defendants provided were severely lacking from the time the patient entered the facility through the patient's discharge.  Time and again patients were not provided proper attention by qualified clinicians at each stage of their treatment for behavioral, psychiatric, and substance abuse services.

389.   These services were intrinsic to the purpose of the federal health care programs, which is to provide and fund quality health care services for beneficiaries. Defendants knowingly failed to properly admit patients, plan for or treat patients' psychiatric conditions, discharge patients, medicate patients, and maintain or provide adequate (or licensed) staffing or facilities.  Defendants often kept patients on service (and billed for them) for excessive and medically unnecessary lengths of stay despite patients' unresponsiveness to treatment, all the while submitting or causing to be submitted false claims to the federal and state health care programs.

390.   Further evidence that Defendants knew (or should have known) that these violations were not only material to the Government's decision to pay, but also fraudulent, is that Defendants took steps to cover their tracks.  When regulators conducted inspections or reviews of their operations, Defendants fraudulently doctored medical records to keep the officials from learning the laws they were violating.

391.   In short, there is more than ample evidence to show that Defendants knew or should have known that their violations had the natural tendency to influence the government's decision to pay the Medicare, Medicaid, TRICARE, and other federal health care program claims and that any reasonable person would attach importance to Defendants' choice of actions.

392.   Many of Defendants' failures are violations of express conditions of payments, and even those that are not violations of express conditions are violations of implied conditions of payment that go the essence of the Government's bargain for the services that Defendants promised to provide to health care beneficiaries.

## V.    DEFENDANTS UNLAWFULLY RETALIATED AGAINST RELATOR

393.   Relator was offered a job at Lakeview on February 26, 2016.

394.   When she was hired by Defendants, she was informed that there were problems at the Lakeview location.

395.   Relator, however, agreed to work there because Acadia promised the necessary staff and resources to correct and dramatically improve the services rendered at that location, and she considered the work a professional challenge.

396.   Many of Relator's lawful actions to stop these improper practices are outlined above in Section IV, including but not limited to her efforts to obtain adequate staffing and appropriate care for these extremely vulnerable patients.

397.   When Relator learned of the many improper practices of Acadia described in detail in section IV above, Relator attempted to correct those deficiencies and, in doing so, performed lawful acts to stop one or more violations of the False Claims Act.

398.   For example, as one example of Relator communicating her concerns and attempting to stop these improper practices, on May 25, 2016, Relator sent an email to Dir. HR 1, which stated in relevant part:

> To date, I have not been supplied with the Policies and
> Procedures that are in use at the facility.  I have been
> requesting these since my first day [].  The actual policies
> that Lakeview uses are no where to be found in the facility
> [].

399.   As Relator raised concerns about Acadia's improper practices such as the lack of written policies, inadequate staffing and alarmingly deficient patient care, Defendants continued their wrongful practices described above.

400.   Because of Relator's lawful acts to correct these deficiencies in care and

to stop Acadia's acts and omissions that constitute violations of the False Claims Act, Acadia began to retaliate against Relator and, ultimately, fired her, in violation of 31 U.S.C. § 3730(h).

401.   As an example, Lakeview management ostracized Relator for voicing and documenting her concerns, and even went so far as to tell her to stop "causing a ruckus" and otherwise stop speaking up about the issues and concerns she was raising, as detailed in this Complaint.

402.   For example, Defendants began to exclude Relator from discussions involving Defendants' responses to federal medical reviews or audits, as described in this Complaint.

403.   In September 2016, as a further act of unlawful retaliation for Relator's lawful acts to correct these improper practices and thus stop one or more violations of the False Claims Act, CEO 1 fired Relator by speakerphone.

404.   At the time, Relator was hired on February 26, 2016, she was provided a "sign-on" bonus.  Once she was fired, Defendants "docked" her final paycheck in that amount.

## COUNT I

### Federal False Claims Act:
### 31 U.S.C. § 3729(a)(1)(A)

405.   The allegations in the preceding paragraphs are incorporated by reference.

406.   Defendants knowingly presented or caused to be presented numerous false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

407.   By virtue of these false or fraudulent claims, Defendants are jointly and severally liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the Act.

408.   As a result of Defendants' violations, the United States has suffered damages in an amount to be determined at trial.

## COUNT II

### Federal False Claims Act:
### 31 U.S.C. § 3729(a)(1)(B)

409.   The allegations in the preceding paragraphs are incorporated by reference.

410.   Defendants knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B).

411.   By virtue of these false or fraudulent claims, Defendants are jointly and severally liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the Act.

412.   As a result of Defendants' violations, the United States has suffered damages in an amount to be determined at trial.

110

## COUNT III

### Federal False Claims Act:
### 31 U.S.C. § 3729(a)(1)(G)

413.   The allegations in the preceding paragraphs are incorporated by reference.

414.   Defendants knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government, or knowingly to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government in violation of 31 U.S.C. § 3729(a)(1)(G).

415.   By virtue of these false or fraudulent claims, Defendants are jointly and severally liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the Act.

416.   As a result of Defendants' violations, the United States has suffered damages in an amount to be determined at trial.

## COUNT IV

### Federal False Claims Based on Anti-Kickback Statute
### 31 U.S.C. § 3729(a)(1)(A); 42 U.S.C. § 1320a-7b(b)

417.   The allegations in the preceding paragraphs are incorporated by reference.

418.   Defendants knowingly presented or caused to be presented numerous false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729 (a)(1)(A).

419.   The claims were false or fraudulent because they were tainted by kickbacks that Defendants knowingly and willfully provided to referring health care entities and

111

providers and further to physicians who contracted with Defendants to induce referrals

for behavioral health services for federal health care program beneficiaries, in violation

of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).

420.   By virtue of these false or fraudulent claims, Defendants are jointly and

severally liable to the United States for incurred damages resulting from such false

claims, trebled, plus civil penalties for each violation of the Act.

421.   As a result of Defendants' violations, the United States has suffered

damages in an amount to be determined at trial.

## COUNT V

### Federal False Claims Based on Anti-Kickback Statute
### 31 U.S.C. § 3729(a)(1)(B); 42 U.S.C. § 1320a-7b(b)

422.   The allegations in the preceding paragraphs are incorporated by reference.

423.   Defendants knowingly made, used, or caused to be made or used false

records or statements material to false or fraudulent claims, in violation of 31 U.S.C. §

3729(a)(1)(B).

424.   The false records or statements included those appearing on Medicare and

Medicaid Provider Agreements and claims submission forms —where Defendants falsely

certified to the United States, inter alia, that their claims for Medicare and Medicaid

payment were true, accurate, and complete—and where Defendants falsely certified to

the United States, inter alia, their compliance with all "Medicare laws, regulations and

program instructions . . . including, but not limited to, the Federal anti-kickback statute."

112

425.   The false records or statements were material to Defendants' claims for Medicare payment because Medicare would not have paid the claims absent the records or statements.

426.   By virtue of these false or fraudulent claims, Defendants are jointly and severally liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the Act.

427.   As a result of Defendants' violations, the United States has suffered damages in an amount to be determined at trial.

## COUNT VI

**California False Claims Act,
Cal. Gov't Code § 12650, et seq.**

428.   The allegations in the preceding paragraphs are incorporated by reference.

429.   Relator also brings this action on behalf of the State of California, against Defendants under the California False Claims Act ("FCA"), Cal. Gov't Code § 12652(c).

430.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the California FCA, Cal. Gov't Code § 12651(a)(1), which creates liability for any person who "[k]nowingly presents or causes to be presented a false or fraudulent claim for payment or approval."

431.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the California FCA, Cal. Gov't

Code § 12651(a)(2), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim."

432.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the California FCA, Cal. Gov't Code § 12651(a)(7), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the state or to any political subdivision, or knowingly conceals or knowingly and improperly avoids, or decreases an obligation to pay or transmit money or property to the state or to any political subdivision."

433.   Pursuant to the California FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Cal. Gov't Code § 12651(a)(1).

434.   As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT VII

### Delaware False Claims & Reporting Act,
### Del. Code Ann. Tit. 6 § 1201, et seq.

435.   The allegations in the preceding paragraphs are incorporated by reference.

436.   Relator also brings this action on behalf of the Government of the State of Delaware, against Defendants under the State of Delaware's False Claims and Reporting Act ("FCA"), Del. Code Ann. tit. 6, § 1203(b)(1).

437.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Delaware FCA, Del. Code Ann. tit. 6, §1201(a)(1), which creates liability for any person who "[k]nowingly presents, or causes to be presented a false or fraudulent claim for payment or approval."

438.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Delaware FCA, Del. Code Ann. tit. 6, §1201(a)(2), which creates liability for any person who "[k]nowingly makes, uses or causes to be made or used a false record or statement material to a false or fraudulent claim."

439.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Delaware FCA, Del. Code Ann. tit. 6, §1201(a)(7), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."

440.   Pursuant to the Delaware FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Del. Code Ann. tit. 6, §1201(a).

441.   As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT VIII

### Florida False Claims Act,
### Fla. Stat. § 68.081, et seq.

442.   The allegations in the preceding paragraphs are incorporated by reference.

443.   Relator also brings this action on behalf of the State of Florida, against Defendants under the State of Florida's False Claims Act ("FCA"), Fla. Stat. § 68.083(2).

444.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Florida FCA, Fla. Stat. § 68.082(2)(a), which creates liability for any person who "[k]nowingly presents or causes to be presented a false or fraudulent claim for payment or approval."

445.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Florida FCA, Fla. Stat. § 68.082(2)(b), creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim."

446.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Florida FCA, Fla. Stat. § 68.082(2)(g), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state."

447.   Pursuant to the Florida FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Fla. Stat. § 68.082(2).

448.   As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT IX

### Georgia False Medicaid Claims Act,
### O.C.G.A. § 49-4-168, et seq.

449.   The allegations in the preceding paragraphs are incorporated by reference.

450.   Relator also brings this action in the name of the State of Georgia, against Defendants pursuant to the State of Georgia False Medicaid Claims Act ("FMCA"), O.C.G.A. § 49-4-168 et seq.

117

451. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Georgia FMCA, O.C.G.A. § 49-4-168.1(a)(1), which creates liability for any person who "[k]nowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval."

452. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Georgia FMCA, O.C.G.A. § 49-4-168.1(a)(2), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim."

453. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Georgia FMCA, O.C.G.A. § 49-4-168.1(a)(7), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit property or money to the Georgia Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit property or money to the Georgia Medicaid program."

454. Pursuant to the Georgia FMCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable

118

to the State for treble damages, civil penalties, and all other relief authorized by law. O.C.G.A. § 49-4-168.1(a).

455.   As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT X

**Illinois False Claims Act,**
**740 Ill. Comp. Stat. 175/1, et seq.**

456.   The allegations in the preceding paragraphs are incorporated by reference.

457.   Relator also brings this action on behalf of the State of Illinois, against Defendants under the Illinois False Claims Act ("FCA"), 740 Ill. Comp. Stat. 175/4(b).

458.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Illinois FCA, 740 Ill. Comp. Stat. 175/3(a)(1)(A), which creates liability for any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."

459.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Illinois FCA, 740 Ill. Comp. Stat. 175/3(a)(1)(B), which creates liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."

460.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Illinois FCA, 740 Ill. Comp.

Stat. 175/3(a)(1)(G), which creates liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State."

461.   Pursuant to the Illinois FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. 740 Ill. Comp. Stat. 175/3(a).

462.   As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XI

### Indiana Medicaid False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.7, et seq.

463.   The allegations in the preceding paragraphs are incorporated by reference.

464.   Relator also brings this action on behalf of the State of Indiana, against Defendants under the State of Indiana False Claims and Whistleblower Protection Act ("FCA"), Ind. Code § 5-11-5.7-4(a).

465.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Indiana FCA, Ind. Code § 5-

11-5.7-2(a)(l), creates liability for any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."

466.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Indiana FCA, Ind. Code § 5-11-5.7-2(a)(2), creates liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement that is material to a false or fraudulent claim."

467.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Indiana FCA, Ind. Code § 5-11-5.7-2(a)(6)(A)-(B), which creates liability for any person who "(A) makes, uses, or causes to be made or used, a false record or statement concerning an obligation to pay or transmit money or property to the state; or (B) conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state."

468.   Pursuant to the Indiana FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Ind. Code § 5-11-5.5-2(b).

469.   As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

# COUNT XII

## Iowa False Claims Act,
## Iowa Code § 685.1, et seq.

470.   The allegations in the preceding paragraphs are incorporated by reference.

471.   Relator also brings this action on behalf of the State of Iowa, against

Defendants under the State of Iowa False Claims Act ("FCA"), Iowa Code § 685.3(2)a.

472.   Defendants, through their material non-disclosures and other wrongful acts

and omissions set forth above, violated the provision of the Iowa FCA, Iowa Code §

685.2(1).a, which creates liability for any person who "[k]nowingly presents, or causes to

be presented, a false or fraudulent claim for payment or approval."

473.   Defendants, through their material non-disclosures and other wrongful acts

and omissions set forth above, violated the provision of the Iowa FCA, Iowa Code §

685.2(1).b, which creates liability for any person who "[k]nowingly makes, uses, or

causes to be made or used, a false record or statement material to a false or fraudulent

claim."

474.   Defendants, through their material non-disclosures and other wrongful acts

and omissions set forth above, violated the provision of the Iowa FCA, Iowa Code §

685.2(1).g, which creates liability for any person who "[k]nowingly makes, uses, or

causes to be made or used, a false record or statement material to an obligation to pay or

transmit money or property to the state, or knowingly conceals or knowingly and

122

improperly avoids or decreases an obligation to pay or transmit money or property to the state."

475.    Pursuant to the Iowa FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Iowa Code § 685.2(1).

476.    As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XIII

### Louisiana Medical Assistance Programs Integrity L aw, La. Rev. Stat. Ann. § 46:437.1, et seq.

477.    The allegations in the preceding paragraphs are incorporated by reference.

478.    Relator also brings this action on behalf of the State of Louisiana's medical assistance programs, against Defendants under the State of Louisiana Medical Assistance Programs Integrity Law ("FCA"), La. Rev. Stat. Ann. § 46:439.1.A.

479.    Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Louisiana FCA, La. Rev. Stat. Ann. § 46:438.3.A, which states that "[n]o person shall knowingly present or cause to be presented a false or fraudulent claim."

480.    Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Louisiana FCA, La. Rev.

123

Stat. Ann. § 46:438.3.B, which states that "[n]o person shall knowingly engage in misrepresentation or make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim."

481.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Louisiana FCA, La. Rev. Stat. Ann. § 46:438.3.C, which states that "[n]o person shall knowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the medical assistance programs, or to knowingly conceal, avoid, or decrease an obligation to pay or transmit money or property to the medical assistance programs."

482.   Pursuant to the Louisiana FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. La. Rev. Stat. Ann. § 46:438.6.

483.   As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XIV

### Maryland False Health Claims Act,
### Md. Code Ann. Health-Gen. § 2-601, et seq.

484.   The allegations in the preceding paragraphs are incorporated by reference.

124

485.   Relator also brings this action on behalf of the State of Maryland, against Defendants under the State of Maryland False Health Claims Act ("FCA"), Md. Code Ann. Health-Gen. § 2-604(a)(1).

486.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Maryland FCA, Md. Code Ann. Health-Gen. § 2-602(a)(1), which states that a person may not "[k]nowingly present or cause to be presented a false or fraudulent claim for payment or approval."

487.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Maryland FCA, Md. Code Ann. Health-Gen. § 2-602(a)(2), which states that a person may not "[k]nowingly make, use, or cause to be made or used a false record or statement material to a false or fraudulent claim."

488.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Maryland FCA, Md. Code Ann. Health-Gen. § 2-602(a)(7), which states that a person may not "[k]nowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or other property to the State."

489.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Maryland FCA, Md. Code Ann. Health-Gen. § 2-602(a)(8), which states that a person may not "[k]nowingly

conceal, or knowingly and improperly avoid or decrease, an obligation to pay or transmit money or other property to the State."

490.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Maryland FCA, Md. Code Ann. Health-Gen. § 2-602(a)(9), which states that a person may not "[k]nowingly make any other false or fraudulent claim against a State health plan or a State health program."

491.   Pursuant to the Maryland FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Md. Code Ann. Health-Gen. § 2-602(b).

492.   As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XV

### The Commonwealth of Massachusetts False Claims Act, Mass. Ann. Laws Ch. 12, § 5A, et seq.

493.   The allegations in the preceding paragraphs are incorporated by reference.

494.   Relator also brings this action on behalf of the Commonwealth of Massachusetts, against Defendants under the Massachusetts False Claims Act ("FCA"), Mass. Ann. Laws ch. 12, § 5C(2).

495.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Massachusetts FCA, Mass.

126

Ann. Laws ch. 12, § 5B(1), which creates liability for any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."

496.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Massachusetts FCA, Mass. Ann. Laws ch. 12, § 5B(2), creates liability for any person who "knowingly makes, uses or causes to be made or used a false record or statement material to a false or fraudulent claim."

497.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Massachusetts FCA, Mass. Ann. Laws ch. 12, § 5B(9), which creates liability for any person who "knowingly makes, uses or causes to be made or used a false record or statement material to an obligation to pay or to transmit money or property to the commonwealth or a political subdivision thereof, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the commonwealth or a political subdivision thereof."

498.   Pursuant to the Massachusetts FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Mass. Ann. Laws ch. 12, § 5B(a).

499.   As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XVI

### Michigan Medicaid False Claims Act, Mich. Comp. Laws Serv. § 400.601, et seq.

500.   The allegations in the preceding paragraphs are incorporated by reference.

501.   Relator also brings this action in the name of the State of Michigan, against Defendants under the State of Michigan Medicaid False Claims Act ("FCA"), Mich. Comp. Laws Serv. § 400.610a(l).

502.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Michigan FCA, Mich. Comp. Laws Serv. § 400.603(1)-(3):

> "(1)   A person shall not knowingly make or cause to be made a false statement or false representation of a material fact in an application for Medicaid benefits.

> (2)   A person shall not knowingly make or cause to be made a false statement or false representation of a material fact for use in determining rights to a Medicaid benefit.

> (3)   A person, who having knowledge of the occurrence of an event affecting his initial or continued right to receive a Medicaid benefit or the initial or continued right of any other person on whose behalf he has applied for or is receiving a benefit, shall not conceal or fail to disclose that event with intent to obtain a benefit to which the person or any other person is not entitled or in an amount greater than that to which the person or any other person is entitled."

503.   Defendants, through their material non-disclosures and other wrongful acts

128

and omissions set forth above, violated the provision of the Michigan FCA, Mich. Comp. Laws Serv. § 400.607(1), which states that "[a] person shall not make or present or cause to be made or presented to an employee or officer of this state a claim under the social welfare act, 1939 PA 280, MCL 400.1 to 400.119b, upon or against the state, knowing the claim to be false."

504.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Michigan FCA, Mich. Comp. Laws Serv. § 400.607(3), which states that "[a] person shall not knowingly make, use, or cause to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state pertaining to a claim presented under the social welfare act."

505.   Pursuant to the Michigan FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Mich. Comp. Laws. Serv. § 400.612.

506.   As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XVII

**Montana False Claims Act,
Mont. Code Ann. § 17-8-401, et seq.**

507.   The allegations in the preceding paragraphs are incorporated by reference.

129

508.   Relator also brings this action on behalf of the State of Montana, against Defendants under the State of Montana False Claims Act ("FCA"), Mont. Code Ann. § 17-8-406(1).

509.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Montana FCA, Mont. Code Ann. § 17-8-403(1), which create liability for any person who:

"(a)    knowingly presents or causes to be presented a false or fraudulent claim for payment or approval;

(b)    knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim; [or]

…

(g)    knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to a governmental entity or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to a governmental entity."

510.   Pursuant to the Montana FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Mont. Code Ann. § 17-8-403(2).

511.   As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XVIII

**Nevada Submission of False Claims to
State or Local Government Act,
Nev. Rev. Stat. § 357.010, et seq.**

512.   The allegations in the preceding paragraphs are incorporated by reference.

513.   Relator also brings this action on behalf of the State of Nevada, against Defendants under the State of Nevada Submission of False Claims to State or Local Government Act ("FCA"), Nev. Rev. Stat. § 357.080(1).

514.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Nevada FCA, Nev. Rev. Stat. § 357.040(l), which create liability for any person who:

"(a)   Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.

(b)   Knowingly makes or uses, or causes to be made or used, a false record or statement that is material to a false or fraudulent claim.
…

(f)   Knowingly makes or uses, or causes to be made or used, a false record or statement that is material to an obligation to pay or transmit money or property to the State or a political subdivision; or

(g)   Knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State or a political subdivision.

515.   Pursuant to the Nevada FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State

131

for treble damages, civil penalties, and all other relief authorized by law. Nev. Rev. Stat. § 357.040(2).

516.   As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XIX

### New Hampshire False Claims Act,
### N.H. Rev. Stat. Ann. § 167:61-B, et seq.

517.   The allegations in the preceding paragraphs are incorporated by reference.

518.   Relator also brings this action on behalf of the State of New Hampshire, against Defendants under the State of New Hampshire False Claims Act ("FCA"), N.H. Rev. Stat. Ann. § 167:61-b, et seq.

519.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of The New Hampshire FCA, N.H. Rev. Stat. Ann. § 167:61-b, which create liability for any person who:

"(a)   Knowingly presents, or causes to be presented, to an officer or employee of the department, a false or fraudulent claim for payment or approval.

(b)   Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the department.

…

(d)   Has possession, custody, or control of property or money used, or to be used, by the department and, intending to defraud the department or willfully to conceal the property,

delivers, or causes to be delivered, less property than the amount for which the person receives a certificate or receipt.

(e)    Knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the department; or

(f)    Is a beneficiary of an inadvertent submission of a false claim to the department, who subsequently discovers the falsity of the claim, and fails to disclose the false claim to the department within a reasonable time after discovery of the false claim."

520.    Pursuant to the New Hampshire FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. N.H. Rev. Stat. Ann. § 167:61-b, et seq.

521.    As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XX

### New Jersey False Claims Act,
### N.J. Stat. Ann. § 2A:32C-1, et seq.

522.    The allegations in the preceding paragraphs are incorporated by reference.

523.    Relator also brings this action in the name of the State of New Jersey, against Defendants pursuant to the State of New Jersey False Claims Act ("FCA"), N.J. Stat. Ann. § 2A:32C-5.b.

524.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of The New Jersey FCA, N.J. Stat. Ann. § 2A:32C-3, which create liability for any person who:

"a.   Knowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval;

b.   Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State;

…

g.   Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State."

525.   Pursuant to the New Jersey FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. N.J. Stat. Ann. § 2A:32C-3.

526.   As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XXI

### New Mexico Medicaid False Claims Act,
### N.M. Stat. Ann. § 27-14-1, et seq.

527.   The allegations in the preceding paragraphs are incorporated by reference.

134

528.   Relator also brings this action on behalf of the State of New Mexico, against Defendants under the State of New Mexico Medicaid False Claims Act ("FCA"), N.M. Stat. Ann. § 27-14-7.B.

529.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the New Mexico FCA, N.M. Stat. Ann. § 27-14-4, which create liability for any person who:

"A.     presents, or causes to be presented, to the state a claim for payment under the Medicaid program knowing that such claim is false or fraudulent;

B.     presents, or causes to be presented, to the state a claim for payment under the Medicaid program knowing that the person receiving a Medicaid benefit or payment is not authorized or is not eligible for a benefit under the Medicaid program;

C.     makes, uses or causes to be made or used a record or statement to obtain a false or fraudulent claim under the Medicaid program paid for or approved by the state knowing such record or statement is false; [or]

…

E.     makes, uses or causes to be made or used a record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the state, relative to the Medicaid program, knowing that such record or statement is false."

530.   Pursuant to the New Mexico FCA, Defendants are thus liable to the State for statutorily defined damages sustained because of the acts of Defendants and such other relief as authorized. N.M. Stat. Ann. § 27-14-4.

531.   As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XXII

### North Carolina False Claims Act,
### N.C. Gen. Stat. § 1-605, et seq.

532.   The allegations in the preceding paragraphs are incorporated by reference.

533.   Relator also brings this action on behalf of the State of North Carolina, against Defendants under the State of North Carolina False Claims Act ("FCA"), N.C. Gen. Stat. § 1-608(b).

534.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the North Carolina FCA, N.C. Gen. Stat. § 1-607(a), which create liability for any person who:

"(1)   Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.

(2)  Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

…

(7)   Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State."

535.   Pursuant to the North Carolina FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. N.C. Gen. Stat. § 1-607(a).

136

536.   As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XXIII

### Oklahoma Medicaid False Claims Act,
### Okla. Stat. Tit. § 63-5053, et seq.

537.   The allegations in the preceding paragraphs are incorporated by reference.

538.   Relator also brings this action in the name of the State of Oklahoma, against Defendants pursuant to the State of Oklahoma Medicaid False Claims Act ("FCA"), Okla. Stat. tit. § 63-5053.2(B).

539.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Oklahoma FCA, Okla. Stat. tit. § 63-053.1(B), which create liability for any person who:

"1.   Knowingly presents, or causes to be presented, to an officer or employee of the State of Oklahoma, a false or fraudulent claim for payment or approval;

2.  Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;

… or

7.   Knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state."

540.   Pursuant to the Oklahoma FCA, based on Defendants' material non-

disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Okla. Stat. tit. § 63-053.1(B).

541.   As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XXIV

### Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1, et seq.

542.   The allegations in the preceding paragraphs are incorporated by reference.

543.   Relator also brings this action in the name of the State of Rhode Island, against Defendants pursuant to the State of Rhode Island False Claims Act ("FCA"), R.I. Gen. Laws § 9-1.1-4(b).

544.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Rhode Island FCA, R.I. Gen. Laws § 9-1.1-3(a), which create liability for any person who:

"(1) Knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;

(2)  Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]

…

(7) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the

state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state…."

545.   Pursuant to the Rhode Island FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. R.I. Gen. Laws § 9-1.1-3(a).

546.   As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XXV

### Tennessee Medicaid False Claims Act,
### Tenn. Code Ann. § 71-5-181, et seq.

547.   The allegations in the preceding paragraphs are incorporated by reference.

548.   Relator also brings this action in the name of the State of Tennessee, against Defendants under the Tennessee Medicaid False Claims Act ("FCA"), Tenn. Code Ann. § 71-5-183(b)(1).

549.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Tennessee FCA, Tenn. Code Ann. § 71-5-182(a)(l), which create liability for any person who:

"(A) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval under the Medicaid program;

(B)  Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim under the Medicaid program; [or]

(C)  Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money, or property to the state, or knowingly conceals, or knowingly and improperly, avoids, or decreases an obligation to pay or transmit money or property to the state, relative to the Medicaid program."

550.   Pursuant to the Tennessee FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Tenn. Code Ann. § 71-5-182(a).

551.   As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XXVI

### Texas Medicaid Fraud Prevention Act,
### Tex. Hum. Res. Code § 36.001, et seq.

552.   The allegations in the preceding paragraphs are incorporated by reference.

553.   Relator also brings this action in the name of the State of Texas, against Defendants under the State of Texas Medicaid Fraud Prevention Act ("FCA"), Tex. Hum. Res. Code § 36.101(a).

554.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Texas FCA, Tex. Hum. Res. Code § 36.002, which create liability for any person who, *inter alia*:

140

"(1) knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

(2) knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

(3) knowingly applies for and receives a benefit or payment on behalf of another person under the Medicaid program and converts any part of the benefit or payment to a use other than for the benefit of the person on whose behalf it was received;
…

(12) knowingly makes, uses, or causes the making or use of a false record or statement material to an obligation to pay or transmit money or property to this state under the Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to this state under the Medicaid program; or

(13) knowingly engages in conduct that constitutes a violation under Section 32.039(b)."

555. Pursuant to the Texas FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Tex. Hum. Res. Code § 36.052.

556. As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

141

## COUNT XXVII

**Vermont False Claims Act,**
**Vt. Stat. Tit. 32, 630, et seq.**

557.   The allegations in the preceding paragraphs are incorporated by reference.

558.   Relator also brings this action in the name of the State of Vermont, against Defendants under the State of Vermont False Claims Act ("FCA"), Vt. Stat. Ann. tit. 32, § 632(b).

559.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Vermont FCA, Vt. Stat. Ann. tit. 32, § 631, which state that no person shall:

"(1) knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval;

(2)   knowingly make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim;

…

(8)   enter into a written agreement or contract with an official of the State or its agent knowing the information contained therein is false;

(9)   knowingly make, use or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State; [or]

(10)  knowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money or property to the State;

560.   Pursuant to the Vermont FCA, based on Defendants' material non-

disclosures and other wrongful acts and omissions set forth above, Defendants are liable

to the State for treble damages, civil penalties, and all other relief authorized by law. Vt.

Stat. Ann. tit. 32, § 631(b).

561.   As a result of Defendants' violations, the state has suffered damages in an

amount to be determined at trial.

## COUNT XXVIII

**The Commonwealth of Virginia
Fraud Against Taxpayers Act,
Va. Code Ann. § 8.01-216.1, et seq.**

562.   The allegations in the preceding paragraphs are incorporated by reference.

563.   Relator also brings this action on behalf of the Commonwealth of Virginia,

against Defendants under the Commonwealth of Virginia Fraud Against Taxpayers Act

("FCA"), Va. Code Ann. § 8.01-216.5(A).

564.   Defendants, through their material non-disclosures and other wrongful acts

and omissions set forth above, violated each of the following provisions of the Virginia

FCA, Va. Code Ann. § 8.01-216.3(A), which create liability for any person who:

"1. Knowingly presents, or causes to be presented, a false or fraudulent claim for
payment or approval;

2.  Knowingly makes, uses, or causes to be made or used, a false record or
statement material to a false or fraudulent claim;

…

143

7. Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Commonwealth or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Commonwealth."

565.   Pursuant to the Virginia FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Va. Code Ann. § 8.01-216.3(A).

566.   As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.  (this needs to be a new para with a new no.)

## COUNT XXIX

### Washington State Medicaid Fraud False Claims Act, Wash. Rev. Code § 74.66.005, et seq.

567.   The allegations in the preceding paragraphs are incorporated by reference.

568.   Relator also brings this action on behalf of the State of Washington, against Defendants under the Washington State Medicaid Fraud False Claims Act ("FCA"), Wash. Rev. Code § 74.66.050(1).

569.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Washington FCA, Wash. Rev. Code § 74.66.020(1), which create liability for any person who:

"(a) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(b)  Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]

…

(g)   Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government entity, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the government entity."

570.   Pursuant to the Washington FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Wash. Rev. Code § 74.66.020(1).

571.   As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

WHEREFORE, Relator, on behalf of herself, the United States, and the States, prays:

(a)    That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of between $5,500 and $11,000 for

145

each violation of the Federal False Claims Act before November 2, 2015, and $11,000 to $21,563 for each violation after November 2, 2015;

(b)      That the Court enter judgment against Defendants in favor of the States and the Relator in the amount of the damages sustained by the States, trebled as provided for in the State FCAs, plus civil penalties for each violation of each of the States' FCAs;

(c)      That Relator be awarded an amount that the Court decides is reasonable for recovering the proceeds of the action, including but not necessarily limited to the civil penalties and damages, on behalf of the United States, which, pursuant to the False Claims Act, shall be at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim if the government intervenes and proceeds with the action, and not less than 25 percent nor more than 30 percent of the proceeds of the action or settlement of the claim if the government does not intervene;

(d)      That the Relator be awarded an amount from the proceeds of the action to the States as provided for in the *qui tam* provisions of each of the individual States' false claims acts;

(e)      That the Court enter judgment against Defendants for damages suffered because of Defendants' retaliation against Relator;

146

(f)     That judgment be entered against Defendants jointly and severally, in the amounts to be determined at trial; and

(g)     That Relator be awarded all costs and expenses incurred, including reasonable attorneys' fees; and

(h)     That the Court order such other relief as is appropriate.

Trial by jury is hereby requested.

Respectfully submitted,

_____

Michael A. Sullivan, Esq.
Georgia Bar No. 691431
Finch McCranie, LLP
225 Peachtree Street, NE
1700 South Tower
Atlanta, Georgia 30303
(404) 658-9070
(404) 688-0649 (fax)
msullivan@finchmccranie.com

*Pro hac vice* pending

Date April 17, 2017          Counsel for Relator Jamie Thompson

147